# Exhibit A

# 2022 CV 05614: AMY SMITH vs UNIVERSITY OF ARIZONA GLOBAL CAMPUS

## Docket Information

**Date**

**Docket Entry**

---

12/16/2022

SUCCESSFUL FEDEX SERVICE

Method : CIVIL FEDEX SERVICE

Issued : 12/14/2022

Service : CIVIL INITIAL SERVICE EFILING

Served : 12/16/2022

Return : 12/16/2022

On : ZOVIO INC.

Signed By : S.ANDREWS

Reason : FEDEX SUCCESSFUL SERVICE

Comment : 12/16/2022 9:58 am: Delivered

Tracking #: 392199790440

Document Type: SUCCESSFUL FEDEX SERVICE

⬇ DOWNLOAD

---

12/16/2022

SUCCESSFUL FEDEX SERVICE

Method : CIVIL FEDEX SERVICE

Issued : 12/14/2022

Service : CIVIL INITIAL SERVICE EFILING

Served : 12/16/2022

Return : 12/16/2022

On : CBE GROUP INC.

Signed By : M.HARTMAN

Reason : FEDEX SUCCESSFUL SERVICE

Comment : 12/16/2022 12:15 pm: Delivered

Tracking #: 392199799230

Document Type: SUCCESSFUL FEDEX SERVICE

⬇ DOWNLOAD

---

12/16/2022

SUCCESSFUL FEDEX SERVICE

Method : CIVIL FEDEX SERVICE

Issued : 12/14/2022

## Docket Information

**Date**
**Docket Entry**

Service : CIVIL INITIAL SERVICE EFILING
Served : 12/16/2022
Return : 12/16/2022
On : UNIVERSITY OF ARIZONA GLOBAL CAMPUS
Signed By : D.PLATT

Reason : FEDEX SUCCESSFUL SERVICE
Comment : 12/16/2022 9:27 am: Delivered

Tracking #: 392199783492
Document Type: SUCCESSFUL FEDEX SERVICE
⬇ DOWNLOAD

12/14/2022
CIVIL SUMMONS ISSUED

CIVIL SUMMONS EFILING
Sent on: 12/14/2022 16:05:17.66
Document Type: CIVIL SUMMONS ISSUED
⬇ DOWNLOAD

12/14/2022
Issue Date: 12/14/2022
Service: CIVIL INITIAL SERVICE EFILING
Method: CIVIL FEDEX SERVICE
Cost Per: $10.00

UNIVERSITY OF ARIZONA GLOBAL CAMPUS
CT CORPORATION SYSTEM R A
4400 EASTON COMMONS WAY SUITE
COLUMBUS, OH 43219
Tracking No: 392199783492

ZOVIO INC.
CT CORPORATION SYSTEM R A
3800 NORTH CENTRAL AVENUE
SUITE 460
PHOENIX, AZ 85012
Tracking No: 392199790440

## Docket Information

**Date**

**Docket Entry**

CBE GROUP INC.
CORPORATION SERVICE COMPANY
3366 RIVERSIDE DRIVE SUITE 10
UPPER ARLINGTON, OH 43221
Tracking No: 392199799230

Document Type: CIVIL FEDEX SERVICE

12/14/2022
CIVIL CONVENIENCE FEE CREDIT CARD
FILED BY BRIAN FLICK Receipt: 1381224 Date: 12/14/2022
Document Type: CIVIL CONVENIENCE FEE CREDIT CARD

12/14/2022
INSTRUCTIONS FOR SERVICE ON A NEW CASE
BY CLERK FILED BY BRIAN FLICK
Document Type: INSTRUCTIONS FOR SERVICE ON A NEW CASE

📥 DOWNLOAD

12/14/2022
CASE INFORMATION SHEET
FILED BY BRIAN FLICK
Document Type: CASE INFORMATION SHEET

📥 DOWNLOAD

12/14/2022
CIVIL DEPOSIT Receipt: 1381224 Date: 12/14/2022
Document Type: CIVIL DEPOSIT

12/14/2022
COMPLAINT
FOR DAMAGES FILED BY BRIAN FLICK Receipt: 1381224 Date: 12/14/2022
Document Type: COMPLAINT

📥 DOWNLOAD

ELECTRONICALLY FILED 3:23-cv-00017-MJN-PBS Doc #: 1-1 Filed: 01/17/23 Page: 5 of 107 PAGEID #: 8
COURT OF COMMON PLEAS
2022-12-14T16:05:18.04
CASE NUMBER: 2022 CV 05614
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO

# IN THE COURT OF COMMON PLEAS, MONTGOMERY COUNTY OHIO
## CIVIL DIVISION

# SUMMONS

| | |
|---|---|
| **PLAINTIFF** | **CASE NUMBER** |
| AMY SMITH | 2022 CV 05614 |
| **VS** | |
| **DEFENDANT** | **ARTICLE NUMBER** |
| UNIVERSITY OF ARIZONA GLOBAL CAMPUS | 392199799230 |
| et al | |

**TO THE FOLLOWING NAMED DEFENDANT:**
CBE GROUP INC.
CORPORATION SERVICE COMPANY
3366 RIVERSIDE DRIVE SUITE 10
UPPER ARLINGTON OH 43221

You have been named a Defendant or Respondent in a complaint filed in Montgomery County Court of Common Pleas, Dayton, Ohio. **A copy of the Complaint is attached.**

**BY:**
AMY SMITH
7613 BERCHMAN DRIVE
HUBER HEIGHTS, OH 45424

**PLAINTIFF ATTORNEY:**
BRIAN D. FLICK
708 WALNUT STREET
SUITE 600
CINCINNATI, OH 45202

You are hereby summoned and required to serve upon the Plaintiff's attorney, or upon the Plaintiff, if the Plaintiff does not have an attorney, a copy of an **Answer to the Complaint** within **28 days after receipt of this summons, exclusive of the day you received the summons.** Your original **Answer** must be filed with the Clerk of Court's Office **within 3 days** after you serve the Plaintiff's attorney or Plaintiff.

**If you fail to appear and defend, Judgment by Default may be rendered against you granting Plaintiff(s) the relief demanded in the Complaint.**

**NOTE:**

If you are represented by an attorney, your attorney is required to electronically file your Answer through the Court's authorized electronic filing system. See Montgomery County Common Pleas Court Loc. R. 1.15, Electronic Filing of Court Documents, for requirements of electronic filing. Local rules can be accessed at www.montcourt.oh.gov. Service of the Answer will be made upon the Plaintiff's attorney through the Court's authorized electronic filing system. If the Plaintiff does not have an attorney, your attorney is required to serve a paper copy of your Answer to the Plaintiff.

If you are representing yourself (appearing pro se), you have the option to file your Answer in paper OR through the Court's authorized electronic filing system (See Loc. R. 1.15, Electronic Filing of Court Documents). Local rules can be accessed at www.montcourt.oh.gov.  If you file your Answer in paper, you are required to serve a paper copy of your Answer to the Plaintiff's Attorney or the Plaintiff.  If you file your Answer electronically, service of the Answer will be made upon the Plaintiff's attorney through the Court's authorized electronic filing system. If the Plaintiff does not have an attorney, you are required to serve a paper copy of your Answer to the Plaintiff.



/s/ MIKE FOLEY, ISSUED Wednesday, December 14, 2022
**MIKE FOLEY, CLERK**
**COURT OF COMMON PLEAS**
**MONTGOMERY COUNTY, OHIO**

**PREPARED ELECTRONICALLY**

**In The Court Of Common Pleas, Montgomery County Ohio**
**Civil Division**

**RETURN OF SERVICE SUMMONS**

| | |
|---|---|
| **PLAINTIFF** | **CASE NUMBER** |
| AMY SMITH | 2022 CV 05614 |
| **VS** | |
| **DEFENDANT** | **ARTICLE NUMBER** |
| UNIVERSITY OF ARIZONA GLOBAL CAMPUS et al | 392199799230 |

**TO THE FOLLOWING NAMED PARTY:**
CBE GROUP INC.
CORPORATION SERVICE COMPANY
3366 RIVERSIDE DRIVE SUITE 10
UPPER ARLINGTON, OH 43221

### RETURN OF SERVICE(PERSONAL)

| | FEES | |
|---|---|---|
| SERVICE | $_____ | |
| MILEAGE | _____ | |
| TOTAL | $_____ | |
| DATE | _____ | |

I received the document on _____, 2022, at ____ o'clock ____ M. and made personal service of it upon _____ by locating him/them and tendering a copy of the document and accompanying documents, on _____, 2022.
By _____

### RETURN OF SERVICE(RESIDENCE)

| | FEES | |
|---|---|---|
| SERVICE | $_____ | |
| MILEAGE | _____ | |
| TOTAL | $_____ | |
| DATE | _____ | |

I received the document on _____, 2022, at ____ o'clock ____ M. and made residence service of it upon _____ by leaving, at his/their usual place of residence with _____ a person of suitable age and discretion then residing therein a copy of the complaint and accompanying documents, on _____, 2022.
By _____

### RETURN OF SERVICE(FAILURE OF SERVICE)

| | FEES | |
|---|---|---|
| SERVICE | $_____ | |
| MILEAGE | _____ | |
| TOTAL | $_____ | |
| DATE | _____ | |

I received the document on _____, 2022, at ____ o'clock ____ M. with instructions to make personal/residence service upon _____ and I was unable to serve a copy documents upon him/them for the following reasons: _____
By _____

PAGE INTENTIONALLY LEFT BLANK

**ELECTRONICALLY FILED**
**COURT OF COMMON PLEAS**
**Wednesday, December 14, 2022 3:11:32 PM**
**CASE NUMBER: 2022 CV 05614 Docket ID: 348440085**
**Mike Foley**
**CLERK OF COURTS MONTGOMERY COUNTY OHIO**

# IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, OHIO

**AMY SMITH**                                        Case No.

7613 Berchman Drive

Huber Heights, Ohio 45424                    Judge

                                                             Magistrate

       Plaintiff                            **Jury Demand Endorsed Hereon**


v.


**THE UNIVERSITY OF ARIZONA GLOBAL
CAMPUS**

℅ CT Corporation System, Registered Agent

4400 Easton Commons Way, Suite 125

Columbus, Ohio 43219,


AND


**ZOVIO, INC.**

℅ CT Corporation System, Registered Agent

3800 North Central Avenue, Suite 460

Phoenix, Arizona 85012, and


AND


**THE CBE GROUP, INC.**

℅ Corporation Service Company, Registered
Agent

3366 Riverside Drive, Suite 103

Upper Arlington, Ohio 43221


       Defendant(s)

---

## COMPLAINT FOR DAMAGES
### (With Jury Demand Endorsed hereon)

---

Plaintiff Amy Smith ("Plaintiff" or "Ms. Smith") and for her Complaint for Damages against Defendants The University of Arizona Global Campus ("UAGC"), Zovio, Inc. ("Zovio"), and The CBE Group, Inc. ("CBE Group") (collectively, the "Defendants") hereby states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Amy Smith ("Ms. Smith") is a natural person who resides at 7613 Berchman Drive, Huber Heights, Ohio 45424 and has resided at this location for all relevant times herein.

2.     Defendant The University of Arizona Global Campus ("Defendant" or "UAGC") is a foreign for-profit corporation headquartered in Chandler, Arizona.  Defendant is an independent, accredited, online institution that is affiliated with the University of Arizona. Defendant is registered to do business in the State of Ohio.

3.     On December 1, 2020, UAGC acquired Ashford University, a post-secondary educational college that was located in San Diego, California prior to the transaction.

4.     Defendant Zovio, Inc. ("Defendant" or "Zovio") is a foreign for-profit corporation headquartered in Chandler, Arizona. Zovio, formerly known as Bridgepoint Education, Inc., served as the parent company to Ashford University until December 1, 2020, when Zovio sold Ashford University to UAGC. Defendant is not registered to do business in the State of Ohio.

5.     Defendant The CBE Group, Inc. ("Defendant" or "CBE Group") is a foreign for-profit corporation headquartered in Cedar Falls, IA. CBE Group is a debt collection agency

which collects past due consumer accounts from debtors throughout the United States, including the State of Ohio. Defendant is registered to do business in the State of Ohio.

6.      This Court has jurisdiction pursuant to Ohio Revised Code ("ORC") § 1345.04 as this action arises under the Ohio Consumer Sales Practices Act ("OCSPA").

7.      Venue lies in this Court pursuant to Ohio Civ. R. 3(C)(3) as Montgomery County is the county in which the defendant conducted activity that gave rise to the claim for relief.

## STATEMENT OF FACTS RELATED TO THE UNIVERSITY OF ARIZONA GLOBAL CAMPUS AND ZOVIO, INC.

8.      Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

9.      At all times relevant, Defendants acted by and through its authorized agents and/or employees before, during, and after the transaction with Ms. Smith.

10.      In 2005, Bridgepoint Education, Inc., purchased The Franciscan University of the Prairies and renamed the institution Ashford University[1].

11.      Ashford University offered both campus and online post-secondary academic programs to students seeking affordable education.

12.      In November 2017, The California Department of Justice ("CDOJ") filed a lawsuit against Ashford University and Zovio, Inc., formerly known as Bridgepoint Education, Inc., alleging that the entities "provided false and misleading information to students to persuade

---

[1] https://www.uagc.edu/about

them to enroll in the school and then used illegal debt collection practices when students struggled to pay their bills."[2]

13.     In August 2020, The University of Arizona announced plans to create a non-profit entity, The University of Arizona Global Campus, that would acquire Ashford University from Zovio, Inc..[3]

14.     On December 1, 2020, Ashford University became The University of Arizona Global Campus.[4]

15.     On March 7, 2022, The San Diego Superior Court found that Ashford University and Zovio, Inc. violated the law by committing unfair business practices, including giving students false or misleading information about the cost of enrollment and financial aid.[5]

16.     The San Diego Superior Court ordered Ashford University and Zovio to pay more than $22.37 million in penalties, as evidenced by a true and accurate copy of the Decision attached to this Complaint as Exhibit A.

17.     During all times relevant to this action, Defendant regularly engaged in business in Ohio and directed solicitations to residents of Ohio.

18.     Defendant's conduct included some or all of the following, among other things:

---

[2]
https://oag.ca.gov/news/press-releases/attorney-general-bonta-continues-fight-hold-ashford-university-accountable
[3] https://www.uagc.edu/about
[4] https://www.uagc.edu/about
[5]
https://oag.ca.gov/news/press-releases/attorney-general-bonta-ashford-university-must-pay-22-million-penalties

a.  holding itself out to the public, including consumers such as Ms. Smith in Ohio, as providing quality and convenient online programs to obtain bachelor and master's degrees in a variety of disciplines and fields of study;

b.  holding itself out to the public, including consumers such as Ms. Smith in Ohio, as providing payment options and resources to help students pay for college;

c.  directing business solicitations into the State of Ohio seeking participation in Defendant's online academic programs;

d.  contracting in Ohio with Ohio consumers for various services, including online academic learning and financial aid assistance; and

e.  offering to perform and performing activities for Ohio residents, including online academic learning and financial aid assistance.

19.  In 2017, Ms. Smith enrolled in Ashford University to obtain a bachelor's degree.

20.  In 2020, following a leave of absence, Ms. Smith sought to re-enter the academic program with Ashford University to resume her coursework and complete her degree. Ms. Smith consulted with Ashford University representatives, including those within the Financial Aid and Services Department.

21.  On or about June 29, 2020, Ms. Smith received an email communication from Ashford University offering Ms. Smith a loan at 0.00% interest to aid in the repayment of Ms. Smith's outstanding balance, as evidenced by a true and accurate copy of the Email attached to this Complaint as Exhibit B.

22.     The loan offer proposed a thirty-five (35) month payment plan of $139.05 per month (the "Loan"). *See* Exhibit B.

23.     To be eligible, Ms. Smith must 1) be a U.S. Citizen or permanent resident; 2) attend or have attended Ashford and have unpaid tuition balance; and 3) be the age of majority in the state of residence at the time of application. *See* Exhibit B.

24.     Ms. Smith met all the required eligibility criteria.

25.     On or about June 29, 2020, Ashford University attempted to process a payment on behalf of Ms. Smith's account in the amount of $1395.05, as evidenced by a true and accurate copy of the Payment Decline attached to this Complaint as Exhibit C.

26.     The payment was declined for insufficient funds. *See* Exhibit C.

27.     On or about June 29, 2020, Ashford University processed a payment on behalf of Ms. Smith's account in the amount of $139.50, as evidenced by a true and accurate copy of the Receipt attached to this Complaint as Exhibit D.

28.     On or about June 30, 2020, Ms. Smith requested a loan application, as evidenced by a true and accurate copy of the Request attached to this Complaint as Exhibit E.

29.     On or about July 2, 2020, Ms. Smith received an email communication from an Ashford University Representative, Denise Neal ("Ms. Neal"), stating that Ms. Smith was ineligible to participate in the loan program because Ms. Smith's outstanding balance was transferred to a 3rd party collector on June 25, 2020, as evidenced by a true and accurate copy of the Email attached to this Complaint as Exhibit F.

30.     Ms. Neal represented that Ms. Smith would be unable to complete her academic program until Ms. Smith's outstanding balance was paid in full. Ms. Neal also represented that

Ashford was "unsure" of the agency that would be handling Ms. Smith's account from this point forward. *See* Exhibit F.

31.     Prior to the communication with Ms. Neal, Ms. Smith had never been advised that she would not be able to return to college due to an outstanding balance. In fact, previous communications with the Defendant indicated that Ms. Smith could resume classes after submitting financial aid applications. A true and accurate copy of the April 26, 2020 Email is attached to this Complaint as Exhibit G. It was further communicated to Ms. Smith that financial aid would take care of any arrears owed.

32.     Prior to the communication with Ms. Neal, Ms. Smith had never been advised that her past due account was sent to a collection agency. In fact, Ms. Smith received an email on May 11, 2020 indicating a past due balance of $5,005.91. The email further communicated Ms. Smith's options to set up a payment arrangement, or make a payment by phone. A true and accurate copy of the May 11, 2020 Email is attached to this Complaint as Exhibit H.

33.     Approximately one month later, on June 25, 2020, Ms. Smith received an email that her account would have to be paid in full. A true and accurate copy of the June 25, 2020 Email is attached to this Complaint as Exhibit I. The contradicting information was confusing and caused Ms. Smith to question her eligibility for the Loan.

34.     Ms. Smith spoke to Ms. Neal on June 29, 2020 in which Ms. Neal assured Ms. Smith that financial aid assistance would cover all back debt owed. Ms. Neal further indicated that to resume classes, Ms. Smith needed only to make the Loan payments until her financial aid application was approved.

35.     On or about July 8, 2020, Ms. Smith communicated her concerns and disappointment in an email to Ms. Neal, as evidenced by a true and accurate copy of the Email attached to this Complaint as Exhibit J.

36.     Ms. Smith was supposed to graduate from Ashford University in 2021. Today, her projected graduation is delayed until the end of 2023.

37.     Ms. Smith would not have contracted with Defendant had it not been for the various oral and written promises and representations made to her about the services Defendant could achieve for her.

38.     Defendant misrepresented to Ms. Smith the consequences that her outstanding account balance would have on her ability to resume her coursework.

39.     Defendant misrepresented to Ms. Smith the eligibility criteria to enroll in Defendant's loan repayment program.

40.     Defendant falsely advertised to Ms. Smith its loan repayment program.

41.     Ms. Smith paid the first monthly installment payment of $139.50 to Defendant to enroll in Defendant's loan repayment program and received nothing substantive in exchange.

## STATEMENT OF FACTS RELATED TO THE CBE GROUP, INC.

42.     Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

43.     At all times relevant, Defendants acted by and through its authorized agents and/or employees before, during, and after the transaction with Ms. Smith.

44.     On or about December 4, 2020, Ms. Smith received debt collection correspondence via regular mail from CBE Group, as evidenced by a true and accurate copy of the Debt Collection Correspondence attached to this Complaint as Exhibit K.

45.     The Debt Collection Correspondence indicated Ms. Smith owed a balance of $4,975.91 and offered to resolve the debt for less than the balance owed. *See* Exhibit K.

46.     Ms. Smith sent written correspondence to CBE Group on multiple occasions disputing the balance owed and requesting validation of the debt, as evidenced by a true and accurate copy of the Disputes attached to this Complaint as Exhibit L.

47.     CBE Group failed to comply with Ms. Smith's requests for debt validation and continued collection efforts to recoup the alleged balance of $4,975.91, despite Ms. Smith's disputing the balance owed.

48.     Between October 2020 and July 2021, Ms. Smith paid a total of $270.00 to CBE Group, as evidenced by a true and accurate copy of the Money Order Receipts attached to this Complaint as Exhibit M.

49.     To date, CBE Group has failed to provide Ms. Smith with the requested debt validation.

50.     To date, CBE Group continues its collection efforts to recoup the alleged balance owed.

## COUNT ONE: VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT – THE UNIVERSITY OF ARIZONA GLOBAL CAMPUS AND ZOVIO, INC.

51.     Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

52.    Ms. Smith is a consumer within the meaning of ORC § 1345.01(D).

53.    Each of the Defendants are a "supplier" as that term is defined by ORC § 1345.01(C).

54.    As demonstrated by the allegations set forth in the preceding paragraphs, the transactions between Ms. Smith and the Defendants are a "consumer transaction" because the services performed by the Defendants on behalf of Ms. Smith were provided for purposes that were primarily for personal, family or household use.

55.    O.R.C. 1345.02(A) provides that "no supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction."

56.    O.R.C. 1345.03(A) provides that "no supplier shall commit an unconscionable act or practice in connection with a consumer transaction."

57.    UAGC and Zovio committed unfair, deceptive, and unconscionable acts or practices in violation of O.R.C. §§ 1345.02(A) and/or 1345.03(A) of the Consumer Sales Practices Act including:

    a.    UAGC and Zovio made false or misleading statements to induce consumers to pay for its purported services;

    b.    UAGC and Zovio had knowledge of the inability of Ms. Smith to receive substantial benefit from the subject of the consumer transaction;

    c.    UAGC and Zovio required Ms. Smith to enter into a consumer transaction on terms that it, as "Supplier" as defined by law, knew was substantially one-sided in its favor; and

d.  Allowing CBE Group to continue to collect upon this debt following the March 2022 rulings from the San Diego Superior Court as to the practices of UAGC and Zovio.

58.  UAGC and Zovio knowingly committed unfair, deceptive, and unconscionable acts and practices.

59.  As a direct and proximate result of the actions of UAGC and Zovio, which violate the CSPA, Ms. Smith is entitled to an award of actual damages of at least $5,385.41, statutory non-economic damages of up to $5,000.00 for her emotional distress, treble damages, and an award of her reasonable attorney's fees and costs.

60.  UAGC and Zovio's actions in this matter have been willful and malicious or have been undertaken with such reckless disregard of Ms. Smith's rights that malice may be inferred, subjecting Defendant to liability for punitive damages.

## COUNT TWO: VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT – THE CBE GROUP, INC.

61.  Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

62.  Ms. Smith is a consumer within the meaning of ORC § 1345.01(D).

63.  The Defendant is a "supplier" as that term is defined by ORC § 1345.01(C).

64.  As demonstrated by the allegations set forth in the preceding paragraphs, the transaction between Ms. Smith and the Defendant is a "consumer transaction" because CBE Group was directly engaged in the business of effecting consumer transactions such as the unsecured, defaulted debt allegedly owed by Ms. Smith.

65. O.R.C. 1345.02(A) provides that "no supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction."

66. O.R.C. 1345.03(A) provides that "no supplier shall commit an unconscionable act or practice in connection with a consumer transaction."

67. State and federal courts in Ohio have held that the Ohio Consumer Sales Practices Act applies to debt collectors. *Hartman v. Asset Acceptance Corp.*, 467 F.Supp.2d 769, 780 (S.D. Ohio 2004).

68. CBE Group committed unfair, deceptive, and unconscionable acts or practices in violation of O.R.C. §§ 1345.02(A) and/or 1345.03(A) of the Consumer Sales Practices Act including attempting to collect on a debt in violation of the Fair Debt Collection Practices Act.

69. Such practices have been previously determined by Ohio courts to violate the Ohio Consumer Sales Practices Act, O.R.C. §§ 1345.01 to 1345.99.

70. CBE Group committed the violations after such decisions were available for public inspection pursuant to Oh. Rev. Code § 1345.05(A)(3).

71. Specifically, the following cases have held that similar unfair and deceptive acts and practices violate the Ohio Consumer Sales Practices Act: *State ex rel. Montgomery v. Montgomery Ward, et al.*, Case No.: 98-CVH-08-6054, Franklin Co. Court C.P. (August 7, 1998)(PIF# 10001674); *State ex rel. DeWine v. Rotech Holdings Ltd.*, Case No.: 15-CV-9736, Franklin Co. Court C.P.(August 1, 2016) (PIF# 3269); and *Becker v. Montgomery*, Lynch (N.D. Oh. 2003), Case No.: 1:02 CV 874 (PIF#10002153).

72. CBE Group knowingly committed unfair, deceptive, and unconscionable acts and practices.

73.     As a direct and proximate result of the actions of CBE Group, which violate the CSPA, Ms. Smith is entitled to an award of actual damages of at least $5,385.41, statutory non-economic damages of up to $5,000.00 for her emotional distress, treble damages, and an award of her reasonable attorney's fees and costs.

74.     CBE Group's actions in this matter have been willful and malicious or have been undertaken with such reckless disregard of Ms. Smith's rights that malice may be inferred, subjecting Defendant to liability for punitive damages.

### COUNT THREE: NEGLIGENCE – DEFENDANTS UAGC AND ZOVIO

75.     Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

76.     UAGC and Zovio carelessly and negligently represented to Ms. Smith that she was eligible to participate in their loan repayment program and further processed the initial installment payment of $139.50 to further confirm her participation in the program.

77.     UAGC and Zovio failed to perform their contractual and common law duty and breached their duty of care to Ms. Smith. Had Defendants exercised proper care and skill in the performance of their common law duties, Ms. Smith would have been spared the considerable damages proximately caused by the Defendants' gross wanton neglect, representations, acts, and omissions.

78.     As a direct and proximate result of Defendants' recklessness, carelessness, and negligence, the Plaintiff suffered and continues to suffer damages including but not limited to actual damages in the amount of $5,385.41, and attorney fees and costs and other expenses, which are not yet known.

**COUNT FOUR: VIOLATIONS OF THE FDCPA – THE CBE GROUP, INC.**

79. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

80. Plaintiff is a consumer as defined in 15 U.S.C. § 1692(a)(1).

81. The private student loans that were the subject of CBE Group's collection action are debts, as defined in 15 U.S.C. § 1692(a)(5).

82. Defendant CBE Group is a debt collector as the term is defined in 15 U.S.C. § 1692(a)(6).

83. CBE Group's actions to collect the debts at issue from October 2020 and continuing to the present time constitute violations of the FDCPA, including, but not limited to the following sections:

    a. § 1692g(a) – Failing to send Ms. Smith a notice of her rights;

    b. § 1692g(b) – Failing to cease collection of the debt which Ms. Smith disputed, in writing, within the 30-day period pursuant to subsection (a) of 15 U.S. Code § 1692g;

    c. § 1692(f)(1)—Engaging in an attempt to collect any amount not authorized by the agreement creating the debt or permitted by law;

    d. § 1692(f)—Engaging in any unfair or unconscionable means to collect or attempt to collect the alleged debt; and

    e. § 1692(e)(2)—Misrepresenting the character, amount, or legal status of the alleged debt.

84. Defendant's conduct caused Ms. Smith anxiety and emotional distress.

85.    Ms. Smith was harmed by CBE Group and is entitled to statutory damages, and attorneys' fees and costs pursuant to 15 U.S.C. § 1692(k)(a).

## COUNT FIVE: CIVIL CONSPIRACY - ALL DEFENDANTS

86.    Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

87.    Defendants constitute a malicious combination of two or more persons.

88.    Defendants have unlawfully, voluntarily, intentionally, and knowingly combined, confederated, and agreed to engage in unlawful acts, or lawful acts in an unlawful manner.

89.    Defendants, through their unlawful acts, caused injury to Ms. Smith by, among other things, 1) depriving Ms. Smith of her ability to obtain a Bachelor's degree from UAGC; 2) causing Ms. Smith extreme financial hardship and emotional distress.

90.    As a direct and proximate result of Defendant's civil conspiracy, Ms. Smith has been damaged in an amount of at least $5,385.41, the exact amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff AMY SMITH respectfully requests the following relief from Defendants The University of Arizona Global Campus, Zovio, Inc., and The CBE Group, Inc. jointly and severally:

A. For an award of actual damages to Ms. Smith of at least $5,385.41 and in a total amount to be determined at trial against the Defendants for the allegations contained in Count I, Count II, Count III, Count IV and/or alternatively Count V of the Complaint;

B. For an award of non-economic damages of up to Five Thousand Dollars ($5,000.00) to Ms. Smith from The University of Arizona Global Campus and Zovio, Inc. for the allegations contained in Count I of the Complaint;

C. For an award of non-economic damages of up to Five Thousand Dollars ($5,000.00) to Ms. Smith from The CBE Group, Inc. for the allegations contained in Count II of the Complaint;

D. For treble damages in an amount to be determined to Ms. Smith from The University of Arizona Global Campus and Zovio, Inc. for the allegations contained in Count I of the Complaint;

E. For treble damages in an amount to be determined to Ms. Smith from The CBE Group, Inc. for the allegations contained in Count II of the Complaint;

F. For punitive damages in an amount to be determined to Ms. Smith from The University of Arizona Global Campus and Zovio, Inc. for the allegations contained in Count I of the Complaint;

G. For punitive damages in an amount to be determined to Ms. Smith from The CBE Group, Inc. for the allegations contained in Count II of the Complaint;

H. For punitive damages in an amount to be determined to Ms. Smith from the Defendants for the allegations contained in Count V of the Complaint;

I. For statutory damages in an amount to be determined to Ms. Smith from The CBE Group, Inc. for the allegations contained in Count IV of the Complaint;

J. For an award of all of Plaintiff's reasonable attorneys' fees and costs against the Defendant for the allegations contained in all Counts of the Complaint;

K. For all other relief this Court deems just and proper.

Respectfully Submitted,

/s/ Brian D. Flick, Esq.
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Marita I. Ramirez (0101882)
DANNLAW
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 e-fax
notices@dannlaw.com

*Attorneys for Plaintiff*

## JURY TRIAL DEMAND

Pursuant to Ohio Rules of Civil Procedure, Rule 38, the Plaintiff, Amy Smith requests and demands a TRIAL BY JURY of all issues as may be tried by a Jury in the litigation as alleged by this COMPLAINT and as may be raised by any current and all future pleadings of any of the current parties or additional parties.

/s/ Brian D. Flick
Brian D. Flick, Esq.

# EXHIBIT A

F I L E D
Clerk of the Superior Court

MAR − 3 2022

By: S. Goodrich, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,** | Case No. 37-2018-00046134-CU-MC-CTL |
| Plaintiff, | **STATEMENT OF DECISION** |
| v. | Action Filed: November 29, 2017<br>Judge: Hon. Eddie C. Sturgeon<br>Dept.: C-67<br>Trial Date: November 8, 2021 |
| **ASHFORD UNIVERSITY, LLC, a California limited liability company; ZOVIO, INC., a Delaware corporation, f/k/a/ BRIDGEPOINT EDUCATION, INC.; and DOES 1 through 50, INCLUSIVE,** | |
| Defendants. | |

1

# TABLE OF CONTENTS

**Page**

I.     OVERVIEW .................................................................................................. 8

II.    PROCEDURAL BACKGROUND ............................................................... 8

III.   STATEMENT OF FACTS ........................................................................... 9

     A.     Ashford University's History and Student Population................................ 9

     B.     Defendants Created a High Pressure Culture in Admissions that Prioritized Enrollment Numbers Over Compliance. ................................ 10

     C.     Defendants Misled Students on Four Topics Critical to Decisionmaking.................................................................................. 12

IV.   STATEMENT OF APPLICABLE LAW ..................................................... 13

     A.     Deception Under the UCL and FAL Means "Likely to Deceive". ........... 13

     B.     Written Disclaimers or Other Truthful Information Cannot Cure Deception on the Phone. ........................................................................ 14

     C.     No Individualized Showing of Actual Deception, Reliance, or Harm Is Required Under the UCL or FAL. ....................................................... 15

     D.     A Defendant's Right to Control Its Employees Is Dispositive. ................ 15

V.     FINDINGS OF FACT AND CONCLUSIONS OF LAW ..................................... 16

     A.     The Evidence Shows Defendants Deceived Students On Topics Critical to Student Decisionmaking. ....................................................... 16

          1.     Defendants Misled Students About Their Ability to Become Teachers Using Ashford Degrees. ................................................. 17

          2.     Defendants Misled Students About Their Ability to Become Nurses, Social Workers, and Drug and Alcohol Counselors. ....... 19

          3.     Defendants Misled Students About How Much Financial Aid They Would Receive and the Costs It Would Cover. ........... 20

          4.     Defendants Misled Students by Downplaying Their Debt. .......... 22

          5.     Defendants Misrepresented Federal Financial Aid Rules............. 22

          6.     Defendants Misrepresented the Feasibility of "Doubling Up". ................................................................................................ 23

          7.     Defendants Understated the Costs of Attendance......................... 23

          8.     Defendants Misled Students About the Pace and Time Commitment of an Ashford Degree......................................... 24

          9.     Defendants Misrepresented Students' Ability to Transfer Credits. ....................................................................................... 25

     B.     The Evidence Shows that Defendants Knew of Extensive Deception Within the Admissions Department....................................................... 26

     C.     Defendants Tolerated or Promoted Repeat Compliance Offenders.......... 29

VI.   DEFENDANTS' DEFENSES . .................................................................. 30

     A.     Zovio Is Liable for the Deception of Its Admissions Counselors............. 30

2

|  |  | B. | Defendants' Written Disclaimers Cannot Cure the Deception in Their Phone Calls, Legally or Factually. ................................... 32 |
|  |  | C. | Third Party Assessments Do Not Defeat Liability.................................... 34 |
|  |  |  | 1. | Regional Accreditation by WASC Does Not Constitute Blanket Approval of Defendants' Admissions Practices. ............. 34 |
|  |  |  | 2. | The Iowa Settlement Was Limited and the Monitor's Findings Are Contradicted by the People's Evidence. ................. 35 |
|  |  |  | 3. | Defendants' Settlement with the CFPB is Not a Defense............ 36 |
|  |  | D. | There Is No Good Faith Defense to Liability, and Regardless, Defendants Did Not Demonstrate Good Faith. ........................................ 36 |
|  |  | E. | There Is Insufficient Evidence To Support Any Remedy For The People's Debt Collection Claims And Demand. ....................................... 37 |
| VII. |  |  | REMEDIES........................................................................................ 38 |
|  |  | A. | Penalties ................................................................................. 38 |
|  |  |  | 1. | Standard and Methodology for Calculating Penalties.................. 38 |
|  |  |  | 2. | Penalty Counts for California Phone Calls, 2013-2020. .............. 40 |
|  |  |  | 3. | Penalty Counts for California Phone Calls, 2009-2012................ 43 |
|  |  |  | 4. | Total Penalty Counts for Nationwide Phone Calls, 2009-2020.................................................................................. 43 |
|  |  |  | 5. | The Statutory Penalty Factors . ....................................... 45 |

3

# TABLE OF AUTHORITIES

Page

CASES

Brady v. Bayer Corp.
(2018) 26 Cal.App.5th 1156 ......................................................... 14, 32

Brockey v. Moore
(2003) 107 Cal.App.4th 86 ............................................................. 14

Cel-Tech Comms., Inc. v. L.A. Cell. Tel. Co.
(1999) 20 Cal.4th 163 ................................................................... 13

Chapman v. Skype Inc.
(2013) 220 Cal.App.4th 217 ........................................................... 32

Chern v. Bank of America
(1976) 15 Cal.3d 866 ........................................................ 13, 14, 15, 32

Clothesrigger, Inc. v. GTE Corp.
(1987) 191 Cal.App.3d 605 ............................................................ 44

Com. on Children's Television, Inc. v. Gen. Foods Corp.
(1983) 35 Cal.3d 197 .................................................................... 13

Cortez v. Purolator Prods. Co.
(2000) 23 Cal.4th 163 ................................................................... 36

Day v. AT&T Corp.
(1998) 63 Cal.App.4th 325 ............................................................. 15

Duran v. U.S. Bank Nat. Assn.
(2014) 59 Cal.4th 1 ...................................................................... 39

Ford Dealers Assn. v. Dept. of Motor Vehicles
(1982) 32 Cal.3d 347 ............................................................ 15, 30, 31

Freeman v. Time, Inc.
(9th Cir. 1995) 68 F.3d 285 ............................................................ 14

Goodman v. FTC
(9th Cir. 1957) 244 F.2d 584 ........................................................ 15, 16

Hill v. Roll Int'l Corp.
(2011) 195 Cal.App.4th 1295 ....................................................... 14, 15

4

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *In re Chevron U.S.A., Inc.*
4       (5th Cir. 1997) 109 F.3d 1016 ................................................................. 39

5   *In re: Tobacco II Cases*
        (2009) 46 Cal.4th 298 ........................................................................ 15
6
    *Kasky v. Nike, Inc.*
7       (2002) 27 Cal.4th 939 ........................................................................ 13

8   *Klein v. Earth Elements, Inc.*
        (1997) 59 Cal.App.4th 965 .................................................................. 14
9
    *Michigan Dept. of Educ. v. U.S. Dept. of Educ.*
10      (6th Cir. 1989) 875 F.2d 1196 ............................................................. 39

11  *People ex rel. Harris v. Sarpas*
12      (2014) 225 Cal.App.4th 1539 .............................................................. 38

13  *People v. Bestline Products, Inc.*
        (1976) 61 Cal.App.3d 879 ................................................................... 38
14
    *People v. Conway*
15      (1974) 42 Cal.App.3d 875 ........................................................... 15, 16, 31

16  *People v. Custom Craft Carpets, Inc.*
17      (1984) 159 Cal.App.3d 676 .................................................................. 45

18  *People v. First Federal Credit Corp.*
        (2002) 104 Cal.App.4th 721 ........................................................... 16, 31
19
    *People v. Forest E. Olson, Inc.*
20      (1982) 137 Cal.App.3d 137 .................................................................. 16

21  *People v. Fremont Life Ins. Co.*
22      (2002) 104 Cal.App.4th 508 ................................................................ 15

23  *People v. JTH Tax, Inc.*
        (2013) 212 Cal.App. 4th 1219 ........................................................ *passim*
24
    *People v. Morse*
25      (1993) 21 Cal.App.4th 259 .................................................................. 39

26  *People v. Overstock.com, Inc.*
27      (2017) 12 Cal.App.5th 1064 ............................................................ 8, 13

28

5

## TABLE OF AUTHORITIES
### (continued)

**Page**

*People v. Super. Ct. (Jayhill)*
(1973) 9 Cal.3d 283 .................................................................................... 15

*Prata v. Super. Ct.*
(2001) 91 Cal.App.4th 1128 ............................................................ 14, 15, 32

*Rob-Mac, Inc. v. Dept. of Motor Vehicles*
(1983) 148 Cal.App.3d 793 ...................................................................... 31, 32

*Sullivan v. Oracle Corp.*
(2011) 51 Cal.4th 1191 ............................................................................... 44

*Tyson Foods, Inc. v. Bouaphakeo*
(2016) 577 U.S. 442 .................................................................................. 39

*U.S. v. Life Care Centers of Am., Inc.*
(E.D. Tenn. 2014) 114 F.Supp.3d 549 ...................................................... 39

*United Farm Workers of America, AFL-CIO v. Dutra Farms*
(2000) 83 Cal.App.4th 1146 ....................................................................... 14

*Wershba v. Apple Computer, Inc.*
(2001) 91 Cal.App.4th 224 ......................................................................... 44

**STATUTES**

Business & Professions Code § 2701 .......................................................... 19

Business & Professions Code § 2732 .......................................................... 19

Business & Professions Code § 2736 .......................................................... 19

Business & Professions Code § 2785 .......................................................... 19

Business & Professions Code § 2786 .......................................................... 19

Business & Professions Code § 4996.1 ....................................................... 19

Business & Professions Code § 4996.2 ....................................................... 19

Business & Professions Code § 4996.18 ..................................................... 19

Business & Professions Code § 4996.23 ..................................................... 19

Business & Professions Code § 17200 .......................................................... 8

Business & Professions Code § 17203 .......................................................... 8

# TABLE OF AUTHORITIES
### (continued)

Page

Business & Professions Code § 17206 .................................................................... 8, 38, 45

Business & Professions Code § 17208 .............................................................................. 8

Business & Professions Code § 17500 ........................................................................ 8, 14

Business & Professions Code § 17535 .............................................................................. 8

Business & Professions Code § 17536 .................................................................... 8, 38, 45

Code of Civil Procedure § 338 ......................................................................................... 8

Education Code § 44225 ................................................................................................. 17

Former Education Code § 44225, subd. (a)(1) added by Stats. 1988, ch. 1355, § 6,
    p. 4473 ................................................................................................................. 17

Health & Safety Code § 11755 ....................................................................................... 19

Health & Safety Code § 11833 ....................................................................................... 19

**OTHER AUTHORITIES**

California Code of Regulations, Title 9 §§13035-13040 ................................................ 19

7

I. **OVERVIEW**

The Court concludes that the People of the State of California ("the People") have proven by a preponderance of the evidence that Defendants Ashford University, LLC and Zovio, Inc. (formerly known as Bridgepoint Education, Inc.) (collectively, "Defendants") violated the law by giving students false or misleading information about career outcomes, cost and financial aid, pace of degree programs, and transfer credits, in order to entice them to enroll at Ashford. The Court awards judgment for the People in the amount of $22,375,782.00 in civil penalties. The Court grants Defendants judgment on liability as to its debt collection practices and the Court denies the People's request for restitution and injunctive relief.

II. **PROCEDURAL BACKGROUND**

The People filed their complaint on November 29, 2017, claiming that Defendants misled students in violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) ("UCL") and the False Advertising Law (Bus. & Prof. Code, § 17500 et seq.) ("FAL"). The People requested an injunction and restitution pursuant to Business and Professions Code sections 17203 and 17535, and civil penalties pursuant to Business and Professions Code sections 17206 and 17536. Prior to this action, the parties signed a tolling agreement with an effective date of February 6, 2013. (Ex. 3654.) Accordingly, the People's UCL claims were tolled to February 6, 2009. (Bus. & Prof. Code, § 17208; *People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064, 1077 [four-year statute of limitations for UCL claims].) The People's FAL claims were tolled to February 6, 2010. (Code Civ. Proc., § 338 subd. (h); *Overstock.com, supra*, 12 Cal.App.5th at p. 1074, n. 8 [three-year statute of limitations for FAL claims].)

Under the terms of the Asset Purchase and Sale Agreement between Ashford, Zovio, and the University of Arizona Global Campus (among other entities), Zovio agreed that it would pay any liabilities arising from the operation of Ashford prior to December 2020. (Ex. 1320.0005.) The parties agreed that the Court may return a single judgment enforceable against Ashford and Zovio. (ROA 566 [Joint Trial Readiness Conference Statement].)

The case proceeded to bench trial before this Court on November 8, 2021. During 18 trial days, the parties had a full opportunity to present evidence and arguments. The court heard and

8

1   assessed the credibility of 23 live witnesses — 13 offered by the AG, 10 offered by Zovio, and 3

2   offered by both parties — and reviewed designated deposition testimony of 17 witnesses. Over

3   fifteen hundred (1,514) exhibits were admitted into evidence.

4       At closing argument, by way of relief, the People asked this Court to impose judgment

5   against Zovio as follows: (a) $25 million in restitution to students, which the People would have

6   this Court deposit into a fund subject to a post-trial "claims-made" procedure for students who

7   would demonstrate that they were financially harmed by Zovio's alleged practices; (b) $75

8   million in civil penalties; and (c) injunctive relief.

9   **III.   STATEMENT OF FACTS**

10      **A.   Ashford University's History and Student Population.**

11      In 2005, Zovio, which had never before offered any degree programs, (Ex. 3743, Tr. 26:21-

12  23 [Clark]), purchased a small campus-based religious institution in Clinton, Iowa called the

13  Franciscan University of the Prairies. (Ex. 3743, Tr. 21:25-22:11 [Clark].) Zovio needed the

14  Franciscan University's accreditation because only students that attend an accredited university

15  are eligible for federal financial aid. (12/6/21 Tr. 224:14-17 [Pattenaude].) Zovio renamed the

16  school Ashford University (Ex. 3743, Tr. 22:4-7 [Clark]) and adopted the legacy of the

17  Franciscan University of the Prairies to market Ashford as a traditional university. (E.g., Ex.

18  1154.0040-41; 11/9/21 Tr. 47:7-48:20 [Dean].) Zovio then transformed the school into an

19  enormous non-religious, online institution, with more than 80,000 students at its peak. (Ex.

20  9017.0012.) Ashford has generated hundreds of millions of dollars for Zovio annually—the vast

21  majority from tax-payer-funded sources like Title IV loans, income-based grants, and GI Bill

22  funds. (See Exs. 9011-9024; see also 12/6/21 Tr. 70:18-24 [Cellini].)

23      As Ashford's former Presidents testified, Defendants enroll vulnerable students who lead

24  "complex" and "difficult lives," which "heightens" the need for accurate college advising.

25  (12/6/21 Tr. 195:23-27 [Pattenaude]; 12/7/21 Tr. 68:12-15 [Pattenaude]; 12/14/21 Tr. 196:20-23

26  [Swenson].) Based on Zovio's own assessments from 2009 through 2020, Ashford students

27  typically are older than traditional college students (Exs. 9013-9034 [average age 35-37]); and are

28  low income (Exs. 9030-9048 [between 55% and 76% receive Pell Grants, which require

9

significant financial need].) Around half of Ashford students identify as minorities. (Exs. 9013-9023 [between 47% and 56%].) Defendants enroll students primarily through sales people (whom Defendants referred to as "admissions counselors")[1] who are trained to build trust and rapport. (E.g., 11/9/21 Tr. 56:3-57:5 [Dean testifying that counselors would "use that friendship almost against [students] as a weapon"].) A typical Ashford bachelor's degree has cost between $40,000 and $60,000 during the statutory period. (See Exs. 9030-9048 [Academic Catalogs 2009-2021].) Only a quarter of Ashford students graduate (12/6/21 Tr. 44:9-18 [Cellini]; see also 12/9/21 Tr. 163:12-14 [Nettles]), and many default on their student loans (12/6/21 Tr. 51:3-5 [Cellini]).

In December 2020, a California non-profit entity affiliated with the University of Arizona acquired Ashford and rebranded the online school as the University of Arizona Global Campus ("UAGC"). (Ex. 1320 [Asset Purchase Agreement].) In exchange for paying $54 million to "sell" Ashford to UAGC, Zovio will now receive 15.5-19.5% of UAGC's tuition revenue for the next 7-15 years. (Ex. 735.0002-3.) Zovio continues to provide many of the services to UAGC that it provided to Ashford. (Ex. 1320.0138; Ex. 3742, Tr. 29:6-19, 39:13-22, 43:10-17, 47:21-48:9 [Clark].)

## B. Defendants Created a High Pressure Culture in Admissions that Prioritized Enrollment Numbers Over Compliance.

The Court heard substantial evidence that over the last decade, Defendants created a high-pressure admissions department whose north star was enrollment numbers. Admissions counselors were expected to call hundreds of leads a day, and managers would threaten to fire those who failed to enroll enough students—warning that "'Someone can fill your chair'" if counselors did not meet their numbers. (Ex. 3753, Tr. 107:15-108:24 [Stewart]; Ex. 792; 12/1/21 Tr. 136:7-15, 137:8-21, 139:5-12, 141:15-142:6, 143:10-21, 149:1-6, 179:7-18, 216:20-25 [McKinley explaining that counselors who "did not sell" were publicly "mocked"].) As stated by one employee of the training department, "From my perspective, based on trainings and coaching, the emphasis for [admissions counselors] is still on submitting applications as quickly as possible." (Ex. 1362.) The high-pressure culture went beyond rhetoric: Defendants put their

---

[1] Admissions counselors have also been called enrollment advisors and enrollment services advisors during the statutory period, but the job functions remained the same. (12/10/21 Tr. 12:27-13:20 [Parenti].)

10

1    words into action by creating "lowest performer lists" and then firing the bottom ten percent of

2    admissions counselors based, in part, on enrollment numbers. (12/7/21 Tr. 59:3-17 [Pattenaude];

3    Ex. 1217; Ex. 3753, Tr. 107:15-109:7 [Stewart]; Ex. 792; 11/10/21 Tr. 22:10-23:1 [Parenti]; Ex.

4    3739, Tr. 107:2-108:24 [Bennett].) Top executives' testimony that Defendants had no quotas (e.g.

5    12/7/21 Tr. 37:9-11 [Pattenaude]; 11/10/21 Tr. 120:21-24 [Parenti]) is not consistent with this

6    evidence and is contradicted by the testimony of former admissions counselors who testified to

7    their job expectations first-hand. Indeed, many defense witnesses admitted having little or no

8    direct knowledge of the admissions department. (E.g., Ex. 3759, Tr. 26:3-16 [Abe]; 12/09/21 Tr.

9    159:23-160:10 [Nettles]; 12/7/21 Tr. 156:1-157:14 [Ogden]; 12/9/21 Tr. 44:1-6 [Farrell].)

10        Defendants' line-level admissions counselors testified to a work environment permeated by

11   fear, where closing the sale was prioritized above providing students with accurate information.

12   For example, as former employee Wesley Adkins testified, "The job was a numbers game and not

13   a – not as advising or a counseling position . . . ." (Ex. 3769, Tr. 31:13-17, 36:25-37:9, 46:4-5

14   [Adkins]; see also 11/9/21 Tr. 29:9-16, 65:19-22 [describing the job as a "numbers game" where

15   you "needed to enroll a certain amount in order to feel safe at [y]our job"], 73:13-74:4 & Ex. 611,

16   78:2-10 [Dean]; 12/1/21 Tr. 136:7-15, 142:4-6, 149:1-6, 204:8-11 [McKinley].) While

17   Defendants' executives testified that the admissions department did not have a high pressure

18   "boiler room" environment (see, e.g., 11/10/21 Tr. 146:15-21 [Parenti]; 12/1/21 Tr. 60:7-21

19   [Hallisy]), a paper trail shows that company executives were well aware of that department's fear-

20   based culture. Ashford's former President Dr. Richard Pattenaude received emails warning that

21   the admissions department was a place where fear was "abundant" and where numbers were seen

22   as the "end-all-be-all." (12/7/21 Tr. 53:3-55:12 [Pattenaude]; Ex. 1214; 12/7/21 Tr. 56:17-57:28

23   [Pattenaude]; Ex. 1213; Ex. 1359.0020.) Yet Dr. Pattenaude could not recall taking any specific

24   steps to address these warnings. (12/7/21 Tr. 53:3-55:12; 56:17-57:28.)

25        Defendants' own employee exit surveys, which they relied on (see Ex. 3767, Tr. 69:19-21,

26   69:24 [Putrus]), further confirm the problematic culture in admissions. For example, in one 2011-

27   2012 survey, over half of respondents said "no" when asked if Bridgepoint "adheres to its core

28   values of ethics, integrity, service, and accountability." (Ex. 1399B [Tab "Question 7"].) One

<center>11</center>

1    employee explained: "The only objective is to enroll as many students as possible. Employees

2    fear for their jobs every day if they are not enrolling enough students." (*Id.* [Tab, "Question 7,"

3    cell C17]; see also cell C21 ["the boiler room mentality is still alive and well"]; see also Ex. 1083

4    [CEO Andrew Clark directing staff in 2020 to "overcome [] objections" of students wanting to

5    withdraw due to COVID, including due to healthcare job demands or kids at home].) Although

6    Defendants' high-level executives testified that they always put students first (see 12/7/21 Tr.

7    34:20-35:13 [Pattenaude]; 12/14/21 Tr. 188:27-190:7 [Swenson]; 12/1/21 Tr. 117:13-25

8    [Hallisy]), the Court finds that testimony lacks credibility because it is contradicted by those with

9    direct admissions experience. As one employee summarized in an exit survey: "When employed I

10   was told the motto of Ashford University was student first, Ashford second, and yourself last.

11   This does not work when a quota must be met. An employee will be reprimanded if the quota is

12   not met, therefore, the employee will always put herself first." (Ex. 1403 [cell AQ19].)

13        **C.    Defendants Misled Students on Four Topics Critical to Decision-making.**

14        The People presented substantial evidence that, as a result of the high-pressure, fear-based

15   culture in the admissions department, counselors made misrepresentations to students in four

16   main areas: the ability to obtain careers requiring licensure with an Ashford degree, the cost of

17   Ashford degrees and financial aid available to pay for them, the pace of Ashford's degrees, and

18   the ability to transfer credits in and out of Ashford (the "Relevant Topics"). (11/15/21 Tr. 72:6-

19   16; 74:7-10 [Lucido].) Within the Relevant Topics, the People presented evidence of 11 specific

20   categories of misrepresentation. (11/15/21 Tr. 74:15-76:13 [Lucido].)

21        Each misrepresentation category was supported by four primary types of evidence. First,

22   the Court heard the testimony of student victims who experienced the misrepresentations and

23   relied upon them in deciding to enroll at Ashford. (Testimony of Alison Tomko, Roberta Perez,

24   Pamela Roberts, Jessica Ohland, Rene Winot, Loren Evans, Crystal Embry, Joseph Ybarra, and

25   Jasmine Cox.) Second, the Court heard the testimony of former Ashford employees, who

26   explained how the pressure to meet their enrollment numbers, the instructions of their managers,

27   and guidance from high performers on their teams all led them to deceive students to overcome

28   objections and promote enrollment. (Testimony of Eric Dean, Lee Bennett, Wesley Adkins, and

12

1  Molly McKinley.) Third, the Court heard the testimony of Dr. Jerome Lucido, an expert in

2  college admissions with over forty years of experience setting industry standards for college

3  advising and leading the admissions, financial aid, and registrar departments of four major

4  universities. (11/15/21 Tr. 50:11-70:22.) Dr. Lucido conducted a methodical and well-

5  documented study of 561 phone calls between students and admissions counselors, through which

6  he identified, categorized, and explained misrepresentations within the Relevant Topics.

7  (11/15/21 Tr. 73:18-74:10; 92:7-95:22.) Dr. Lucido's testimony regarding exemplar calls and the

8  role of the admissions counselor was well supported by his experience, and corroborated by the

9  testimony of the student and employee witnesses.[2] The Court therefore finds Dr. Lucido's expert

10  testimony credible and gives it significant weight. Fourth, the People presented internal company

11  documents and testimony of company witnesses, which corroborated Dr. Lucido's assessment of

12  misrepresentations in the four topical areas. (E.g., testimony of former Ashford Presidents,

13  testimony of Defendants' compliance officials, training documents.) The Court describes this

14  evidence in greater detail with respect to each category of misrepresentation in Part V.A, below.

15  **IV.  STATEMENT OF APPLICABLE LAW**

16    A.  **Deception Under the UCL and FAL Means "Likely to Deceive".**

17    To prove a cause of action under the fraudulent prong of the UCL and under the FAL,[3] "it

18  is necessary only to show that 'members of the public are likely to be deceived.' [Citation]."

19  (*Com. on Children's Television, Inc. v. Gen. Foods Corp.* (1983) 35 Cal.3d 197, 211.]) "'Intent of

20  the disseminator and knowledge of the customer are both irrelevant.'" (*Overstock.com, supra,* 12

21  Cal.App.5th at p. 1079, citing *Chern v. Bank of America* (1976) 15 Cal.3d 866, 876.) This is

22  because the UCL and FAL "afford[] protection against the probability or likelihood as well as the

23  actuality of deception or confusion. [Citation]." (*Ibid.*) Unlike the UCL, the FAL has an

24  

25    [2] The fact that Dr. Lucido did not review any phone calls between Defendants and the testifying students is not relevant. The Court finds significant similarities between the deception identified by Dr. Lucido in the phone calls and the stories of the testifying victims.

26    [3] Courts have consistently held that the "likelihood of deception" standard applies equally to the FAL and fraudulent prong of the UCL. (See, e.g., *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951.) Additionally, a violation of

27  the FAL is also a violation of the UCL under the latter's unlawful prong, which "'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. [Citation.]"

28  (*Cel-Tech Comms., Inc. v. L.A. Cell. Tel. Co.* (1999) 20 Cal.4th 163, 180.)

13

1  additional requirement that the misleading nature of the communications "is known, or . . . by the

2  exercise of reasonable care should be known" by the defendant. (Bus. & Prof. Code § 17500.) By

3  their plain language, the UCL and FAL apply to single acts of misconduct—no pattern or practice

4  of misconduct is required for liability. (See *Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th

5  965, 968 fn. 3 [UCL "covers single acts of misconduct."]; *United Farm Workers of America,*

6  *AFL-CIO v. Dutra Farms* (2000) 83 Cal.App.4th 1146, 1163 [same].)

7       "'[T]he primary evidence in a false advertising case is the advertising itself." (*Brockey v.*

8  *Moore* (2003) 107 Cal.App.4th 86, 100.) Each deceptive statement must be assessed in the

9  context of the full advertisement in which it is conveyed. (*Hill v. Roll Int'l Corp.* (2011) 195

10  Cal.App.4th 1295, 1304-1305; *Freeman v. Time, Inc.* (9th Cir. 1995) 68 F.3d 285, 290.)

11  However, there is no authority for the proposition that this Court must consider every sequential

12  communication a defendant has with a consumer in order to determine whether a particular

13  communication is deceptive. (See Part VI.B, *infra*, for additional discussion.)

14       **B.   Written Disclaimers or Other Truthful Information Cannot Cure**
          **Deception on the Phone.**
15

16       California law also makes clear that a deceptive statement cannot be cured by separate

17  disclosures. (See *Prata v. Super. Ct.* (2001) 91 Cal.App.4th 1128, 1145 ["The fact that disclosures

18  and the credit agreement issued by Bank One stating the 'details' of the program may have

19  explained that the program was, in fact, not as advertised, does not ameliorate the deceptive

20  nature of this advertising."]; *Chern, supra*, 15 Cal.3d at p. 876 ["Moreover the fact that defendant

21  may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not

22  excuse defendant's practice of quoting a lower rate in its initial dealings with potential

23  customers."]; *Brady v. Bayer Corp.* (2018) 26 Cal.App.5th 1156, 1172 ["You cannot take away in

24  the back fine print what you gave on the front in large conspicuous print."].) This is true even

25  when the later disclosure is made in writing and acknowledged by the consumer. (*Chern, supra*,

26  15 Cal.3d at p. 876.) The no-cure rule flows logically from the established principle that a

27  "reasonable consumer need not be exceptionally acute and sophisticated and might not

28

14

1  necessarily be wary or suspicious of advertising claims. [Citation.]" (*Hill v. Roll Internat. Corp.*

2  (2011) 195 Cal.App.4th 1295, 1304.)

3    **C.    No Individualized Showing of Actual Deception, Reliance, or Harm Is Required Under the UCL or FAL.**

4

5    Neither the UCL nor FAL require a showing of causation, reliance, or a specific injury;

6  rather, "the only requirement is that defendant's practice is unlawful, unfair, deceptive, untrue, or

7  misleading." (*Prata, supra,* 91 Cal.App.4th at p. 1144; *People v. Fremont Life Ins. Co.* (2002)

8  104 Cal.App.4th 508, 532 [noting "the rule that restitution under the UCL may be ordered *without*

9  *individualized proof of harm* is well settled"] [emphasis added]; *Day v. AT&T Corp.* (1998) 63

10  Cal.App.4th 325, 332 ["[A]llegations of actual deception, reasonable reliance, and damage are

11  unnecessary."].) As the California Supreme Court explained, this distinction with the common

12  law "reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in

13  service of the statute's larger purpose of protecting the general public against unscrupulous

14  business practices. [Citation.]" (*In re: Tobacco II Cases* (2009) 46 Cal.4th 298, 312.)

15    **D.    A Defendant's Right to Control Its Employees Is Dispositive.**

16    Neither the UCL nor FAL require the People to separately prove that Defendants authorized

17  deception by their admissions counselors. Rather, deceptive statements by employees are treated

18  as acts by the business's agents for which the business is liable. (*Ford Dealers Assn. v. Dept. of*

19  *Motor Vehicles*[4] (1982) 32 Cal.3d 347, 360-361 [citing *Chern, supra,* 15 Cal.3d at p. 866, *People*

20  *v. Super. Ct. (Jayhill)* (1973) 9 Cal.3d 283, and *People v. Conway* (1974) 42 Cal.App.3d 875 as

21  examples of cases in which a corporation was held liable for the acts of its employees]; see also

22  *Goodman v. FTC* (9th Cir. 1957) 244 F.2d 584, 592 ["[T]he courts take the view that the principal

23  is bound by the acts of the salesperson he chooses to employ."].) That is, so long as the defendant

24  has the right to control the activities of its employees, it is liable for their misrepresentations. (See

25  *Ford Dealers, supra,* 32 Cal.3d at p. 361 & fn. 8; *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th

26  1219, 1242 [UCL/FAL liability available on agency theory where defendant has the ability to

27  control its agent, whether defendant exercised that authority or not]); see also *Conway, supra,* 42

28    ───────────────────
[4] The Court discusses *Ford Dealers* at greater length in Part VI.A, *infra*.

15

1   Cal.App.3d at p. 886 [defendant in "position to control" employees was liable for false

2   advertising]; *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721, 735 [same].)

3       Nor does a Defendant immunize itself from liability by having policies prohibiting the

4   misrepresentations; rather, it is the efficacy of these polices that matters. (See *JTH Tax, supra,*

5   212 Cal.App.4th at pp. 1248-1249 [company liable for agents' misrepresentations even though

6   they were prohibited]; *Goodman, supra,* 244 F.2d at p. 592.) Further, a company is liable for

7   misrepresentations it fails to prevent that it knows of or, by exercise of reasonable care, should

8   have known of. (*People v. Forest E. Olson, Inc.* (1982) 137 Cal.App.3d 137, 139-140; *Conway,*

9   *supra,* 42 Cal.App.3d at p. 886 [defendant liable who knew of misrepresentations and permitted

10   them to continue]; *First Federal Credit Corp., supra,* 104 Cal.App.4th at p. 735 [same].)

11  **V.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**

12      **A.    The Evidence Shows Defendants Deceived Students On Topics Critical to Student Decision-making.**

13

14       The Court finds that Defendants operated a high-pressure admissions department where the

15   primary focus was enrollment numbers rather than truthful advising. (See Part III.B, *supra.*) In

16   this environment, admissions counselors would cross a "gray line" ethically or "do things they

17   wouldn't normally do" to boost their numbers to keep their jobs. (Ex. 3769, Tr. 216:5-218:1,

18   276:11-18 [Adkins]; Ex. 3739, Tr. 194:17-195:10 [Bennett]; 12/1/21 Tr. 202:25-203:5, 204:8-11,

19   216:18-25 [McKinley].) As multiple former Ashford employees testified, they gave half-truths, or

20   even outright lied, in order to "overcome objections" that risked derailing enrollment. (Ex. 3739,

21   Tr. 146:1-149:6, 150:23-155:5, 174:17-177:6, 180:16-21 [Bennett]; Ex. 3769, Tr. 55:7-57:22

22   [Adkins]; 11/9/21 Tr. 28:2-28, 39:2-16, 42:28-43:7, 46:4-15, 50:11-14 [Dean] & Ex. 3680

23   ["Rebuttals" training document]; 12/1/21 Tr. 153:1-192:28 [McKinley] & Exs. 474, 2038, 2043,

24   3734.) Specifically, the Court finds that Defendants engaged in misrepresentations in each of the

25   11 categories within the Relevant Topics.

26

27

28

<div align="center">16</div>

1.  **Defendants Misled Students About Their Ability to Become Teachers Using Ashford Degrees.**

The evidence shows that Defendants falsely promised students they could use an Ashford degree to become teachers. In fact, Ashford degrees do not qualify Ashford graduates for most teaching positions, which require teacher licensure. (11/15/21 Tr. 102:8-11 [Lucido].) This includes public school teaching jobs, which in California comprise 85% of teaching positions, and many private schools, which may require or prefer licensure. (11/15/21 Tr. 102:11-25 [Lucido]; 12/9/21 Tr. 47:12-19, 49:7-28 [Farrell].) To obtain licensure, aspiring teachers must attend a state-approved teaching program. (11/15/21 Tr. 103:24-104:2 [Lucido].) Not a single online Ashford degree has ever been state approved for teaching.[5] (Ex. 911 [Defs. Second Am. Resp. to Set 1 RFA 1, 2, 3].) As a result, students who are deceived into enrolling at Ashford must invest significant additional time (1-2 years) and money in a state-approved teaching program. (11/15/21 Tr. 105:27-107:12 [Lucido].)[6]

Between 8,000 and 10,000 students enroll in Ashford's College of Education every year (12/09/21 Tr. 46:16-19 [Farrell]), including students with teaching goals. (12/09/21 Tr. 45:24-46:19 [Farrell]; Ex. 3757, Tr. 116:16-18 [Farrell].) The testimony of Alison Tomko and Crystal Embry demonstrates how Defendants misled these aspiring teachers. Ms. Tomko enrolled at Ashford because her admissions counselor reassured her that Ashford was part of an "interstate agreement" that meant her degree would "carry over" to Pennsylvania so long as she completed her student teaching and passed the state teaching exams. (11/8/21 Tr. 131:14-133:13, 136:27-137:1 [Tomko]; Ex. 165.)[7] Only after graduating did Ms. Tomko learn that she would need to

---

[5] In California, Ashford's Education Studies degree did not even satisfy the state's basic bachelor's degree requirement for teachers because, until 2018, California required teaching credential applicants to have a bachelor's degree in a subject other than education. (Former Ed. Code, § 44225, subd. (a)(1) added by Stats. 1988, ch. 1355, § 6, p. 4473.) The law was amended in 2018, but the ban on education bachelor's degrees remains in place for middle and high school teachers. (Ed. Code, § 44225, subds. (a)(1)(A)-(a)(1)(B), as amended by Stats. 2017, ch. 123, § 1, p. 1898, eff. Jan. 1, 2018.) Ashford Dean Dr. Tony Farrell was not aware that any restrictions on education degrees currently exist in California. (12/9/21 Tr. 68:6-8 [Farrell].)

[6] While alternative certification programs may exist, those programs have their own requirements (Ex. 3757, Tr. 64:14-64:21 [Farrell]), and there is no evidence that any Ashford student successfully completed one. (12/9/21 Tr. 49:3-6 [Farrell].)

[7] The Court finds credible Ms. Tomko's testimony that her advisor told her to contact the state Department of Education closer to graduation. (11/8/21 Tr. 134:13-135:7, 137:2-14, 193:9-16 [Tomko].) In any event, the

17

1   complete an additional 60-90 credits before she could even begin her student teaching. (11/8/21

2   Tr. 148:18-149:14, 151:13-23 [Tomko]; Ex. 170.) Because Ms. Tomko could not afford those

3   credits, she never became certified, and now works as a phlebotomist, which does not require a

4   bachelor's degree. (11/8/21 Tr. 154:5-159:9 [Tomko].) Similarly, Crystal Embry was misled into

5   enrolling at Ashford and withdrawing from a different school that would, in fact, have led to

6   teacher licensure, because Defendants told her they offered the "same program," just online.

7   (11/30/21 Tr. 80:18-25, 82:11-22 [Embry].) Only after graduating did Ms. Embry learn that her

8   Ashford education did not qualify her to take the state teaching exam. (11/30/21 Tr. 90:2-25

9   [Embry].) This testimony is corroborated by Dr. Lucido's call analysis, which identified 10 calls

10   with at least one teaching misrepresentation. (11/15/21 Tr. 77:19-25 [Lucido].) Had Ashford not

11   led these students to believe that their degrees were in the type of program that leads to licensure,

12   they instead could have attended a "two-in-one" teaching program: a four-year bachelor's degree

13   program that is *also* approved for state teaching. This is an option offered, for example, at many

14   of the California State University campuses. (11/15/21 Tr. 104:19-27 [Lucido].)[8]

15       The Court concludes that, as Dr. Lucido explained, counselors likely misled students with

16   statements like, "What this means in a nutshell is that you get your teaching degree from us,"

17   because such statements convey that Ashford's degrees have the kind of state approval that

18   allows students to move directly to student teaching or state teaching exams, when they do not.

19   (11/15/21 Tr. 109:9-110:8 [Lucido]; Ex. 2380.) That is precisely what Ms. Tomko and Ms.

20   Embry reasonably believed. Further, evidence from Defendants' own training documents and

21   witnesses confirms they knew it was likely to deceive students to suggest Ashford degrees lead to

22   teaching careers. (Ex. 1040 ["Don't say 'You will need your Bachelor's first, then you can take

23   more steps to get your license'"]; 12/9/21 Tr. 56:3-57:4 [Farrell].)

24

25

26   <sub>specifics of this warning do not change the fact that Ms. Tomko's advisor also gave her false information regarding</sub>

27   Ashford's membership in an "interstate agreement" that would allow Ms. Tomko to move directly to student teaching
after graduation.

28   [8] Dr. Farrell's testimony that these blended programs take "longer" than four years is not credible given that
he was unaware of these California State University programs. (12/9/21 Tr. 50:24-27 [Farrell].)

18

## 2. Defendants Misled Students About Their Ability to Become Nurses, Social Workers, and Drug and Alcohol Counselors.

There is also ample evidence that Defendants misled students about their ability to use an Ashford degree to pursue a career as a nurse, drug and alcohol counselor, or social worker ("the helping careers"). Like teaching, these professions require attending an approved program and obtaining licensure or certification.[9] Ashford degrees are not state-approved for any of the helping careers. (Ex. 3575 [Defs. Resp. to Set 5 RFA 86, 89, 90, 91]; Ex. 3753, Tr. 215:22-216:14 [Stewart]; 11/10/21 Tr. 56:19-27 [Parenti].) Yet Defendants repeatedly encouraged students with those career aspirations to enroll at Ashford. As Dr. Lucido explained, affirmatively describing Ashford as "perfect" or "geared for" students who aspire to the helping careers is deceptive because Ashford's programs lack the programmatic accreditation required for licensure. (11/15/21 Tr. 113:17-115:5 [Lucido]; Ex. 2323 [helping career call].)

Again, the testimony of Ashford's victims shows how statements like those Dr. Lucido identified are likely to deceive students about their ability to achieve the helping careers with an Ashford degree. For example, Roberta Perez testified that her admissions counselor told her a master's degree in Psychology would allow her to work in "[c]ounseling, social work, therapy, [and] human services" so Ms. Perez reasonably believed her Ashford degree would meet the degree requirements for a therapy license. (11/17/21 Tr. 18:21-27, 19:14-22, 42:10-43:23 [Perez].) Only after graduating with $40,000 in student loans did Ms. Perez discover that she would need to complete an entirely separate program. (11/17/21 Tr. 27:20-30:6, 36:22-37:8 [Perez]; Ex. 331 [Perez rejection letter].) Similarly, Pamela Roberts's counselor told her it would be "no problem" to become a certified substance abuse counselor with an Ashford degree. (11/18/21 Tr. 17:3-18:16, 19:7-18 [Roberts].) A week before graduation, Ms. Roberts learned that her degree did not meet any of the requirements to become a certified substance abuse counselor. (11/18/21 Tr. 23:11-20, 24:22-25:26, 72:20-24 [Roberts].) And Jasmine Cox's counselor told her

---

[9] Bus. & Prof. Code §§ 4996.1, 4996.2, subd. (b), 4996.18, subd. (b)(1), 4996.23 (requiring accredited social work program for social work licensure); Health & Saf. Code, §§ 11755, subd. (k), 11833, subd. (b)(1); Cal. Code Regs., tit. 9, §§ 13035-13040 (requiring program endorsed by a state certifying organization to obtain certification and provide counseling); Bus. & Prof. Code, §§ 2701, 2732, 2736, 2785, 2786 (requiring state-approved nursing program to obtain nursing license and practice as a nurse).

19

1 that an Ashford degree would "allow [her] to be a nurse." (Ex. 3766, Tr. 20:6-9, 21:12-17 [Cox].)

2 Dr. Lucido identified 7 calls with similar misrepresentations directed at the helping careers.

3 (11/15/21 Tr. 77:22-78:1 [Lucido].)

4   As with teaching, Defendants knew it was likely to deceive students to suggest Ashford

5 degrees lead to the helping careers. (Ex. 1035.0005 ["Ashford University cannot prepare students

6 for licensure or certification"].) Yet the evidence shows that this form of deception was

7 widespread. For example, Jenn Stewart, whom Defendants promoted to lead their training

8 department, suggested an Ashford degree to a student clearly interested in nursing. (Ex. 3753, Tr.

9 216:17-218:16, 219:2-4 [Stewart]; Ex. 815 [email with student].) Similarly, Ms. McKinley

10 testified that her team frequently misled students into thinking they could become social workers

11 or nurses the "moment after getting the degree from" Ashford. (12/1/21 Tr. 162:28-174:5

12 [McKinley]; Ex. 2038; Ex. 2043.) Lee Bennett, who worked in Defendants' Student Inquiry

13 Center, explained that he was trained to transfer students with nursing or counseling interests to

14 the "perfect" counselor, who would attempt to enroll the student despite Ashford's lack of

15 counseling or nursing programs. (Ex. 3739, Tr. 184:23-185:4; 194:17-25 [Bennett].) The Court

16 finds that Defendants routinely misled students regarding their ability to pursue the helping

17 careers with an Ashford degree.

18   **3. Defendants Misled Students About How Much Financial Aid They Would Receive and the Costs It Would Cover.**

19

20   Defendants misrepresented the amount of financial aid that students would receive and the

 costs that aid would cover. As Dr. Lucido explained, "unless an admissions officer is holding a []

21

 financial aid award letter," they "cannot fairly characterize" whether or how much financial aid

22

 any given student will receive, and it is misleading to do so. (11/15/21 Tr. 119:13-120:7

23

 [Lucido].) This includes misrepresentations that students will receive a specific type or amount of

24

 aid (grants or loans) (17 calls), that aid will cover specific costs (3 calls), that students will

25

 receive a stipend (15 calls), or that students would have no, or only limited, out-of-pocket costs

26

 (11 calls).[10] (11/15/21 Tr. 120:11-121:8 [Lucido]; Ex. 3728.)

27

28   [10] In none of these calls did the admissions counselor reference a final award letter. (11/15/21 Tr. 124:12-18 [Lucido].)

1       Student and former employee testimony again confirms that statements like these were

2 likely to deceive. For example, Loren Evans testified that her admissions counselor promised that

3 financial aid would cover the costs of her degree so that she would not have out-of-pocket costs

4 until after graduation. (11/30/21 Tr. 34:14-27 [Evans].) Ms. Evans discovered this promise was

5 false when she reached her lifetime loan limit just a few classes shy of graduating and was forced

6 to drop out, leaving her with massive debt but no degree. (11/30/21 Tr. 41:3-48:20, 50:22-51:2

7 [Evans].) Ms. Cox testified to a similar experience: though her Ashford advisor promised that

8 financial aid would fully cover her costs, she discovered two years into her degree that she owed

9 an out-of-pocket balance because she had exceeded her lifetime loan limit. (Ex. 3766, Tr. 23:2-

10 15, 28:20-29:7, 29:20-30:1 [Cox].) Unable to afford her remaining classes, she—like Ms.

11 Evans—was forced to withdraw. (Ex. 3766, Tr. 33:23-25 [Cox]; see also Ex. 3765, Tr. 52:2-16,

12 59:21-60:2, 108:15-21 & Ex. 194 [Ybarra was promised $5,000 in Pell Grants]; 12/1/21 Tr.

13 188:4-189:2 [McKinley and "everyone around" her told students "it was very likely" they would

14 receive Pell Grants"].) Making unsupported representations about aid and out-of-pocket costs is

15 misleading because only Ashford's financial services department is responsible for packaging

16 financial aid, issuing award letters, and answering specific financial aid questions. (11/10/21 Tr.

17 25:3-8 [Parenti].) Indeed, on average, over 75% of students who ultimately received financial aid

18 did not receive their award letter until after enrollment, and one-third of students who received

19 financial aid did not receive their award letter until after the Ashford Promise[11] expired and they

20 were financially liable. (Ex. 3597; see also 12/8/21 Tr. 198:19-199:18 [Curran], Ex. 1063.0003.)

21       Defendants plainly recognized that it was misleading for admissions counselors to predict

22 aid awards or out-of-pocket costs. (See, e.g., Ex. 1328 ["Don't say" "Based on my experience,

23 you will receive the Pell Grant" or that "Financial aid will cover all of your costs for your

24 program."].) The Court finds statements in this category deceptive.

25

26

27

---

28    [11] The Ashford Promise provides a 100% tuition refund for first course if student drops within the first three weeks. (Ex. 3572.0010-0011 [Defs. Am. Resp. to Set 3 RFA 54, 55].)

21

### 4. Defendants Misled Students by Downplaying Their Debt.

The Court finds that admissions counselors also misled students by downplaying their future debt. For example, counselors deceptively quoted students' loan payments at a small fraction of their potential magnitude. (11/9/21 Tr. 32:18-33:8 [Dean testifying he would downplay debt].) As Dr. Lucido testified, the four calls he identified in this category were misleading because admissions counselors cannot know how much debt a student will take on, what a student's loan payments will be, or the student's ultimate ability to make those payments. (11/15/21 Tr. 78:6-8, 134:11-135:2 [Lucido].) More specifically, assurances to students that their payments "might be like $50 a month or it might be $75" are misleading because they minimize student debt and the actual payment could easily be several hundred dollars. (11/15/21 Tr. 135:8-28 [Lucido]; Ex. 2356.0021; 11/30/21 Tr. 107:15-25, 143:27-144:3 [Embry was told her loan payments would be minimal and that her loans would be forgiven if she taught for ten years].) Defendants admit that this type of statement is deceptive. (11/10/21 Tr. 41:26-43:13 [Parenti].)

### 5. Defendants Misrepresented Federal Financial Aid Rules.

Substantial evidence shows that Defendants misled students about the rules and requirements governing federal financial aid, which Dr. Lucido testified limits students' ability to understand how to access financial aid and when they might receive their financial aid. (11/15/21 Tr. 141:16-142:2 [Lucido].) Dr. Lucido identified 8 calls with these misrepresentations (11/15/21 Tr. 78:9-11 [Lucido]), including: stating that the government will subsidize interest on all loans when it will not (Ex. 1514; Ex. 2265),[12] stating that Pell Grants are given to any actively enrolled student when there are significant need-based restrictions (Ex. 2366), and misstating other eligibility requirements for various types of financial aid (Ex. 2262; Ex. 2390). (11/15/21 Tr. 142:19-144:12 [Lucido].) Defendants knew it was deceptive to misstate these financial aid rules. (E.g., 11/10/21 Tr. 29:12-25 [Parenti agreeing that excess funds cannot be used for any purpose].)

---

[12] While Dr. Lucido noted and explained this misrepresentation in his Appendix E (Ex. 1495.0030), Defendants' expert Dr. Yoram (Jerry) Wind was not even aware of the difference between subsidized and unsubsidized loans when he conducted his call review, and therefore failed to identify this misrepresentation. (12/13/21 Tr. 224:23-26 [Wind].)

22

### 6. Defendants Misrepresented the Feasibility of "Doubling Up".

The evidence shows that Defendants misled students about the feasibility of "doubling up," or taking two classes simultaneously, rather than the standard one class at a time. As Dr. Lucido explained, doubling up can generate out-of-pocket costs of over $1,000 per Ashford class because financial aid is limited per academic year. (11/15/21 Tr. 148:18-150:1 [Lucido].) Defendants' own internal documents and witnesses confirm that Defendants knew it was misleading to tell students about doubling up on classes without also disclosing the additional costs. (See, e.g., Ex. 1330 ["[F]inancial aid may not be applied to the cost of the second course and will be an out-of-pocket expense."]; 11/10/21 Tr. 47:6-9 [Parenti].) Vice President of Financial Aid and Student Services Kyle Curran testified that counselors should inform students that doubling up creates out-of-pocket costs. (12/8/21 Tr. 151:19-152:17 [Curran].) Nevertheless, Dr. Lucido's call analysis identified 30 calls with this misrepresentation. (11/15/21 Tr. 78:12-14 [Lucido]; see, e.g., Ex. 2350 [representative said student could double up and graduate in two years, which would generate significant out-of-pocket costs]; 11/15/21 Tr. 151:3-152:5 [Lucido]; see also 12/1/21 Tr. 189:10-17 [McKinley testifying that advisors commonly offered students the option of doubling up].) The Court agrees that this category of misrepresentation was deceptive.

### 7. Defendants Understated the Costs of Attendance.

The Court finds that the People presented ample evidence that Defendants misled students about the cost of an Ashford degree. First, counselors led students to believe tuition costs represented the entire cost, when in fact costs include significant books and fees expenses. (11/15/21 Tr. 155:9-156:15 [Lucido]; Ex. 2386; Ex. 3728 [Lucido identified 15 calls in Category 4a[13]]; 12/8/21 Tr. 149:16-25 [Curran admitting that when quoting costs, counselors should include books and fees].) Second, counselors quoted costs that did not match the academic catalog, for example by understating the cost of a degree program by more than $8,000.[14] (11/16/21 Tr. 123:19-124:23 [Lucido]; Ex. 2399; Ex. 3728 [Lucido identified 4 calls in Category

---

[13] Ex. 1495.0001-8 shows which categories correspond to which misrepresentations.

[14] Again, by contrast, defense expert Dr. Wind did not know the cost of Ashford's degree programs (and did not give his coders that information), and so he failed to identify this misrepresentation in his call review. (12/13/21 Tr. 238:3-5 [Wind].)

23

1    4b].) Third, counselors inaccurately compared Ashford's price with other schools, for example by

2    claiming that U.C. Berkeley is more expensive than Ashford, when in fact Ashford costs more for

3    the same number of credits. (11/15/21 Tr. 157:22-159:14 [Lucido]; Ex. 2312; Ex. 3728 [Lucido

4    identified 2 calls in Category 4d].) Finally, Defendants misled students about the total cost of an

5    Ashford degree by quoting the cost per "academic year." As Dr. Lucido explained, students

6    reasonably believe one academic year represents one fourth of the cost of a bachelor's degree,

7    when it fact in is only one fifth of the cost at Ashford. (11/15/21 Tr. 161:4-162:5 [Lucido].) That

8    is because, unlike a traditional 4-year school, Ashford divides its bachelor's degrees into 5

9    "academic years," so students must multiply by 5 to determine their total cost, not by 4. (*Id.*; Ex.

10    3572 [Defs. Am. Resp. to Set 3 RFA 58, 60]; Ex. 9036.0213.) Alison Tomko testified that when

11    her admissions counselor quoted the cost of Ashford at around $10,000 per academic year, Ms.

12    Tomko reasonably believed that her degree would therefore cost around $40,000, when in fact it

13    cost more than $50,000. (11/8/21 Tr. 161:5-162:19, 165:6-9 [Tomko]; Ex. 172.) Dr. Lucido

14    identified 12 calls where quoting the cost per academic year likely led students like Ms. Tomko to

15    believe their degree would cost less than it actually would. (Ex. 3728 [Category 4c]; e.g., Ex.

16    2395.)

17         **8.**    **Defendants Misled Students About the Pace and Time Commitment**
               **of an Ashford Degree.**

18

19         The evidence demonstrates that Defendants misrepresented the pace of completing an

20    Ashford degree by wrongly characterizing their bachelor's degree programs as accelerated and

21    akin to traditional four-year programs. In fact, Ashford degrees take *longer* than degrees at a

22    traditional university. (11/15/21 Tr. 167:16-26 [Lucido].) At a traditional school, students earn a

23    total of 30 credits between September and May, which allows them to finish a 120-credit degree

24    in four calendar years, with summers off. (11/15/21 Tr. 168:17-169:19 [Lucido].) By contrast, a

25    typical Ashford student must take classes for 50 weeks per year – with no summer break – to earn

26    the same 30 credits. (11/15/21 Tr. 168:17-169:11 [Lucido]; Ex. 3572.0012.) This is substantially

27    more weeks per year to earn the *same* 120-credit degree. (11/15/21 Tr. 169:24-28 [Lucido].)

28

1    Dr. Lucido identified 27 calls in which admissions counselors falsely described Ashford's

2    program as a 4-year program, and 2 calls describing it as accelerated. (11/15/21 Tr. 78:19-25

3    [Lucido]; Ex. 3741.) For example, Dr. Lucido identified a representative stating, "you would be

4    taking eight classes a year and that you'll maintain that pace for, you know, an average

5    graduation rate of four years, so 120 credits." (Ex. 2285.) This is false because taking 8 courses

6    for 4 calendar years would leave the student 24 credits short. (11/15/21 Tr. 171:7-27 [Lucido];

7    Ex. 2285.) As falsehoods, these statements are likely to deceive Ashford's students about the pace

8    of their degrees. (11/15/21 Tr. 166:1-25, 170:1-7 [Lucido].) Defendants admit that it is

9    "inaccurate" to describe their degrees as "accelerated," but their own records show counselors

10   told students this misleading information. (11/10/21 Tr. 72:1-21 [Parenti]; Ex. 3735.)

11        **9.    Defendants Misrepresented Students' Ability to Transfer Credits.**

12        The evidence shows that Defendants misled students about the ability to transfer credits in

13   and out of Ashford. As explained by Dr. Lucido and several students, transfer credits matter

14   because they can reduce the time and cost of a degree. (11/15/21 Tr. 174:9-175:5 [Lucido];

15   11/30/21 Tr. 95:8-12 [Embry testifying that credits accepted meant "a shorter amount of time for

16   me to be in school."].) Admissions counselors routinely made inaccurate promises that students'

17   prior credits or life experience would transfer before the student received an evaluation from the

18   responsible department: Ashford's Registrar. (11/15/21 Tr. 83:5-12 [Lucido]; Ex. 3573 at 9:20-

19   27, 12:6-18, 69:18-25; see also 11/10/21 Tr. 48:18-50:22 [Parenti].) For example, Jessica

20   Ohland's admissions counselor stated that at least half of her prior credits would transfer into

21   Ashford "no matter what." Only after Ms. Ohland completed her first class did she learn that just

22   20 of her 69 prior credits had transferred, extending the time to degree completion. (Ex. 3771, Tr.

23   18:12-20:4, 25:12-26:11, 27:4-6, 85:17-25 [Ohland]; Ex. 3705 [Ohland]; see also Ex. 3765, Tr.

24   146:17-147:25 [Ybarra] [12 of 59 credits applied to Ashford degree].)

25        The testimony of students like Ms. Ohland mirror the 39 calls that Dr. Lucido identified

26   with at least one misrepresentation about students' ability to transfer credits into Ashford.

27   (11/15/21 Tr. 78:26-79:4 [Lucido].) As Dr. Lucido explained, statements like "we'll make sure to

28   apply that" are likely to deceive students into thinking their credits or experience will be accepted

25

1   (11/15/2021 Tr. 180:11-27 [Lucido]; Ex. 2316), when in fact students receive official credit

2   evaluations no earlier than four weeks after enrolling. (Ex. 3754, Tr. 183:2-17, 183:20-184:20

3   [Scheie]; Ex. 3746, Tr. 308:3-312:2 [Nettles]; Ex. 760-B.)

4       Dr. Lucido also explained why Defendants should not tell students that their Ashford

5   credits will transfer out and apply elsewhere: because Defendants do not know the transfer rules

6   of other institutions. (11/15/21 Tr. 79:2-4 [Lucido identifying 4 calls]; 11/15/21 Tr. 183:17-184:3

7   [Lucido].) In fact, transferring Ashford credits out is far from assured. (See Ex. 3762, Tr. 59:24-

8   60:11 [none of Ms. Winot's credits transferred out]; 11/30/21 Tr. 49:1-10 [less than half of Ms.

9   Evans's credits transferred out].)

10       Defendants knew it was misleading to promise or imply credits would transfer. (Ex. 1332

11   [Say This Not That training document]; 12/1/21 Tr. 33:25-28 [Hallisy].) Nevertheless, multiple

12   former employees testified that misrepresentations like the ones Dr. Lucido identified were

13   routinely made and encouraged by managers. (11/9/21 Tr. 44:25-45:3, 50:11-14 [Dean testifying

14   he suggested transfer into Ashford was guaranteed]; 12/1/21 Tr. 180:25-181:13, 185:25-186:3

15   [McKinley testifying she would "sell it as though [credits] were going to transfer"]; 12/1/21 Tr.

16   177:22-178:1 [McKinley testifying her manager liked statements that Ashford credits would

17   transfer "to any other schools"] & Exs. 474, 2005 [template emails promising credit transfer].)

18   **B.   The Evidence Shows that Defendants Knew of Extensive Deception Within the Admissions Department.**

19       Defendants were well aware of the deception pervading their admissions department. Over

20   the last decade, Defendants amassed an extensive paper trail documenting the same

21   misrepresentations identified by Dr. Lucido. The People's expert Greg Regan, a forensic

22   accountant, conducted an analysis of Defendants' own scorecard data[15] to determine the

23   frequency and type of non-compliant statements in their admissions calls. (12/2/21 Tr. 14:18-

24   15:16 [Regan].) Mr. Regan's de-duplication efforts (12/2/21 Tr. 23:20-25:11), consolidation of

25   Defendants' Excel[16] and SQL scorecards (12/2/21 Tr. 26:8-28:22), and tabulations of the rates

26

27       [15] Scorecards are documents that the compliance department used to assess calls between students and employees. (11/10/21 Tr. 65:24-28, 67:10-68:8 [Parenti]; see, e.g., Ex. 9002.)

28       [16] The Court finds that Mr. Regan's use of Excel scorecards is reasonable because they were the only data

1    and numbers of non-complaint scorecards (12/2/21 Tr. 37:19-21, 38:11-42:22, 58:2-59:9, 126:11-

2    127:4), were adequately explained and the Court gives Mr. Regan's analysis weight.

3        At a high level, Mr. Regan's analysis revealed that admissions counselors made non-

4    compliant statements in 20.5% of scorecards discussing a topic relevant[17] to this case, for a total

5    of 749,981[18] non-compliant calls nationwide.[19] (12/2/21 Tr. 45:2-47:12, 58:19-59:9, 126:11-127:4

6    [Regan]; Ex. 3420.) Further, the evidence showed that compliance personnel were trained to, and

7    in fact did, comprehensively mark *both* compliant and non-compliant verbiages when completing

8    scorecards (12/13/21 Tr. 34:13-16; 36:14-37:5 [Chappell]), supporting Mr. Regan's testimony

9    that the 20.5% rate accurately captures the percentage of calls with at least one relevant non-

10   compliant statement, and rebutting Defendants' contrary assertions. (12/2/21 Tr. 38:11-39:2,

11   126:11-127:4 [Regan]).[20]

12        Defendants had the capacity to and did analyze their own compliance data. (Ex. 3749, Tr.

13   84:19-87:25 [Chappell].) Indeed, at trial, Defendants presented their own analysis of their call

14   scorecards, touting a compliance rate that rose from 75% in 2012 to 94.7% in 2018. (Ex.

15   942.0014 & 12/9/21 Tr. 209:12-211:18 [Chappell].) The Court gives this evidence some weight

16   source for part of the statutory period and the percentage of calls with a relevant non-compliant statement does not

17   materially change when using Regan's consolidated data set versus only SQL (20.5% v. 20%). (12/2/21 Tr. 23:22-28, 25:21-27, 47:17-49:7 [Regan] & Ex. 3423; see also 12/13/21 Tr. 60:16-19 [Chappell] [only Excel available until 2012].)

18   [17] The Court finds that it was reasonable for Mr. Regan to rely on the Attorney General's determination of

19   which scorecard verbiages were relevant. (12/2/21 Tr. 37:22-38:2 [Regan].) This identification allowed Mr. Regan to exclude verbiages regarding problems not relevant to this case like missing FERPA verification (Ex. 3416 [list of

20   relevant verbiages for Mr. Regan's analysis].) Moreover, the rate of non-compliance was *higher* – 25% – for all call scorecards versus those with relevant verbiages, which demonstrates that the relevance limiter did not bias the results

21   in the People's favor. (12/2/21 Tr. 38:15-41:28 [Regan].) Finally, to the extent any verbiages were included in error, there is no evidence they would have materially impacted Mr. Regan's results. (12/2/21 Tr. 131:14-135:7 [Regan]

22   [verbiages raised during cross examination occurred on ten or less scorecards out of 157,000 scorecards].)
     [18] This includes only scorecards from 2013 to 2020. (12/2/21 Tr. 57:18-58:5 [Regan].)

23      [19] The Court finds that Mr. Regan appropriately classified statements rated "development opportunity" or

24   "coaching" as non-compliant, in addition to "issues." Defendants frequently used the "development opportunity/coaching" rating and the "issue" rating for identical or nearly identical statements, such as "guaranteed

25   student's credits will transfer into their program." (12/2/21 Tr. 34:16-35:2 [Regan].) The "development opportunity/coaching" rating was also used for statements that cannot reasonably be classified as compliant,

26   including "Representative advised that financial aid will cover the student's entire cost of tuition" and
  "Representative advised the student that [Ashford's] academic program or programs can lead to becoming a social

27   worker." (12/13/21 Tr. 51:9-53:17 [Chappell]; see also Ex. 7668.) Even compliance leader Jeanne Chappell described these ratings as "dangerously close" to an "issue." (12/9/21 Tr. 205:2-4 [Chappell].)
     [20] Moreover, 12,000 SQL call scorecards include both compliant and non-compliant statements. (Ex. 9010

28   [Tableau database containing SQL call scorecards].)

1   because it is evidence that the Defendants were attempting to improve their admissions

2   department.

3        From 2012 to 2014, Defendants also received mystery shopper reports from a company

4   called Norton Norris, which documented specific misrepresentations regarding financial aid and

5   transfer credits. (Ex. 3760, Tr. 17:7-14, 26:3-26:7, 115:23-116:2 [Norton], Exs. 285, 289, 1285,

6   1286, 1408–1425.) These reports, which Mr. Norton testified were the "gold standard" for

7   mystery shopping[21] (Ex. 3760, Tr. 35:6-8 [Norton]), revealed systematic deception in admissions.

8   In one 2014 report, every single call was rated either "untruthful or unethical" or "incomplete or

9   potentially misleading." (Ex. 1414.0001-2; see also Ex. 3760, Tr. 35:6-7 [Norton]; Exs. 285, 289,

10  1285, 1286, 1408-1425.) These were not sporadic or isolated statements of which management

11  was unaware. Yet management failed to take Norton Norris's findings seriously, testifying that it

12  was "consistent with a zero-tolerance approach to compliance" to have nearly one-third of

13  counselors guaranteeing transfer credits. (11/10/21 Tr. 108:8-15 [Parenti].) Rather than fix these

14  problems, Defendants discontinued the mystery shopper program. (Ex. 3760, Tr. 115:23-116:2,

15  148:24-149:7 [Norton].)

16       Internal documents further demonstrate that Defendants understood the extent of the

17  deception emanating from the admissions department. For example, Defendants' Associate

18  Director of Compliance, Matthew Hallisy, observed "areas where the level of negligence is

19  astonishing" in his role overseeing admissions call monitoring. (Ex. 259.) As one manager under

20  Mr. Hallisy put it, he felt "weary of identifying the same repetitive non-compliant behavior on the

21  phones," and urged the company "do something radically different to stop this seemingly endless

22  cycle." (Ex. 262.0002-3.) Yet Mr. Hallisy testified he saw no need to take action. (11/30/21 Tr.

23  238:7-14 [Hallisy].) Similarly, a report from Defendants' internal ombudsman office, which was

24  circulated to dozens of top executives, reported that counselors were "telling potential students

25  that we offer fully certified teaching degrees" and "guaranteeing as to [financial aid] amounts that

26  would be received or credits that will be transferred." (Ex. 1359.0012-13.) Yet Ms. Alice Parenti,

27      [21] By contrast, Mr. Norton admitted he never spoke to an admissions counselor and that he "didn't have
    [the] kind of insight" needed to evaluate the compliance program. (Ex. 3760, Tr. 104:4-104:10, 115:2-8, 130:25-
28  131:1 [Norton].)

                                                28

1  then the Divisional Vice President of Admissions, could not recall taking any steps to address the

2  ombudsman's concerns. (11/10/21, Tr. 202:12-205:21 [Parenti].) Finally, executives received

3  troubling complaints directly from students, yet failed to take appropriate action. (E.g., Exs. 1033,

4  1034, 1048 [student complaints about teaching misrepresentations] & 12/9/21 Tr. 61:1-63:4

5  [Farrell testifying he did not report these complaints to admissions or compliance].)

6     **C.**   **Defendants Tolerated or Promoted Repeat Compliance Offenders.**

7       Defendants' treatment of repeat compliance offenders also illustrates their knowledge and

8  acceptance, even approval, of misrepresentations. Mr. Regan's expert testimony revealed that

9  nearly 1,000 admissions counselors accumulated at least 10 non-compliant calls, some many

10  more. (12/2/21 Tr. 51:1-25 [Regan].) For example, Michael Corner and Corey Howard

11  accumulated 94 and 83 non-compliant scorecards. (12/2/21 Tr. 137:18-24, 138:25-139:17

12  [Regan].) Given that Defendants scored less than 1% of their calls, the true scope of non-

13  compliance suggested by Defendants' own data is much greater. (12/2/21 Tr. 50:2-19 [Regan].)

14       This expert testimony was corroborated by the testimony of Defendants' current

15  compliance leader Jeanne Chappell. (12/9/21 Tr. 188:27-28 [Chappell].) Ms. Chappell admitted

16  repeating the same corrective action for admissions counselor Ralph Mastracchio for two non-

17  compliant statements to students, despite being aware that Mr. Mastracchio had previously

18  accumulated approximately *fifty* non-compliant statements during his tenure. (12/13/21 Tr. 77:13-

19  83:27 [Chappell]; Ex. 3443 [email documenting Mastracchio history].)

20       This level of non-compliance among line-level admissions employees follows logically

21  from Defendants' promotion decisions. For example, Mr. Regan testified that Defendants

22  promoted 87 counselors who made relevant non-compliant statements in at least *half* of their

23  monitored calls. (12/2/21 Tr. 54:8-16 [Regan].) Mr. Regan also explained that 131 admissions

24  managers supervised teams that made relevant non-complaint statements in at least half of their

25  calls. (12/2/21 Tr. 55:18-56:18 [Regan] [also noting 94 of those 131 continued to supervise for

26  multiple years].) Defendants' decision to promote, rather than meaningfully discipline, repeat

27  offenders undermines their claims that students' interests were put first and that deception was

28  not tolerated (see, e.g., 12/6/21 Tr. 206:9-207:8 [Pattenaude]; 12/7/21 Tr. 41:21-42:5

29

1 [Pattenaude[22]); 11/10/21 Tr. 73:8-10 [Parenti]), particularly juxtaposed against their practice of

2 firing the bottom 10% of employees based in part on enrollment numbers. (Ex. 3753, Tr. 107:15-

3 108:25 [Stewart]; Ex. 792; 11/10/21 Tr. 22:10-23:1 [Parenti].)[23]

4 As multiple former employees testified, one result of Defendants' approach to compliance

5 was an admissions floor where counselors worried frequently about meeting their numbers, and

6 rarely about compliance. (Ex. 3769, Tr. 85:4-11 [Adkins] ["We never -- there was never a

7 concern about compliance. There was always a concern about meeting your matrix numbers."];

8 12/1/21 Tr. 214:6-7 [McKinley] ["I really wasn't even aware that we had a compliance

9 department."].) The evidence that these employees did receive some compliance-related

10 corrective action, (e.g., 11/9/21 Tr. 137:22-25 [Dean]; Ex. 3769, Tr. 221:8-12 [Adkins]), is not

11 entitled to significant weight if actions by compliance were not perceived as serious.

12 The failures of the compliance department were likely exacerbated by its diminished

13 capacity over time. (12/9/21 Tr. 170:17-171:4 [Chappell testifying that compliance personnel fell

14 from 32 to 6]; 12/13/21 Tr. 32:16-19 [Chappell testifying that minutes monitored per counselor

15 fell from 75 to 30 after Iowa monitorship, see Part IV.C, *infra*, ended]; 12/14/21 Tr. 125:2-18

16 [Johnson testifying he was laid off and told his position as VP of Ethics and Compliance was

17 "redundant"].)

18 **VI. DEFENDANTS' DEFENSES.**

19 **A. Zovio Is Liable for the Deception of Its Admissions Counselors.**

20 Defendants are liable for their admissions counselors' misrepresentations because

21 Defendants indisputably had the right to control their activities. (See *Ford Dealers*, *supra*, 32

22 Cal.3d at pp. 360-361; *JTH Tax*, *supra*, 212 Cal.App.4th at p. 1242; see, e.g., 11/10/21 Tr. 119:1-

23 5 [Parenti]; 12/9/21 Tr. 217:21-218:12 [Chappell].) The right to control is sufficient for UCL and

24 ---

[22] Dr. Pattenaude's testimony regarding compliance also lacks credibility given that he could not recall being made aware of a "single instance" of non-compliance while President. (12/7/21 Tr. 46:6-14 [Pattenaude].)

25 [23] There is also evidence that Defendants failed to contact students that call monitoring indicated were likely misled. As Wesley Adkins testified, when he received a non-compliant scorecard, nobody asked him to call back the

26 student to provide corrected information. (Ex. 3769, Tr. 80:18-24 [Adkins].) Defendants' assertion that they had an "unwritten policy" to follow up with certain students (11/10/21 Tr. 198:28-199:10 [Parenti]) is not credible given that

27 Defendants generally committed counselor training to writing, and given Mr. Johnson's testimony that written training was "valuable" because "humans can forget." (12/14/21 Tr. 138:12-23 [Johnson].)

28

1    FAL liability, even if Defendants did not exercise that control to prevent deceptive practices. It is

2    also common sense that an employer can condone deception without uttering the words, "You are

3    authorized to lie." Indeed, the evidence shows that despite formal training, (see, e.g., 12/9/21 Tr.

4    190:11-19 [Chappell]; 12/1/21 Tr. 43:2-22 [Hallisy]), the pressure to enroll created an

5    environment in which misrepresentations were tolerated and even encouraged.[24] (See Part V.C,

6    *supra.*) Moreover, Defendants knew of deception at unacceptable levels for a decade. (See Part

7    V.B, *supra.*) This is more than sufficient to hold Defendants liable. (See, e.g., *Conway, supra,* 42

8    Cal.App.3d at p. 886; *First Federal Credit Corp., supra,* 104 Cal.App.4th at p. 735.)

9          Nor do Defendants fall into the narrow exception identified in *Ford Dealers,* that a

10   company might be able to avoid liability for its agents' misrepresentations if *all* of the following

11   conditions were met: the company (1) made every effort to discourage misrepresentations, (2) had

12   no knowledge of its agents' misleading statements, and (3) when so informed, refused to accept

13   the benefits of any sales based on misrepresentations and took action to prevent a reoccurrence.

14   (*Ford Dealers, supra,* 32 Cal.3d at p. 361, fn. 8.) No subsequent case has applied *Ford Dealers* to

15   defeat liability. To the contrary, the two appellate courts that have considered the exception

16   concluded it did not apply. (See *JTH Tax, supra,* 212 Cal.App.4th at pp. 1247-1248 [noting

17   exception would only apply in "unusual circumstances"]; *Rob-Mac, Inc. v. Dept. of Motor*

18   *Vehicles* (1983) 148 Cal.App.3d 793, 798-799 [same].) In any case, the exception does not apply

19   here. The evidence shows that first, Defendants knew of misleading statements, including through

20   their own scorecards, the Norton Norris mystery shopping reports, their exit surveys, their

21   ombudsman, and other whistleblowers. (See Part V.B, *supra.*) Second, Defendants made scant

22   "effort to discourage" the misrepresentations. They terminated Norton Norris, promoted

23   employees with repeated compliance infractions, continuously ran a high-pressure admissions

24   floor, and did not heed whistleblowers' warnings. (See Part V.C, *supra.*) Third, with one or two

25   isolated exceptions, Defendants did not refuse to accept the benefits of enrollment based on

26   misrepresentations. (Compare 12/7/21 Tr. 26:21-27:7 [Pattenaude testifying to forgiving one

27          [24] The Court affords little weight to the testimony by Defendants' managers and executives that deception
was not authorized, because they had superficial knowledge of the day-to-day experience of admissions counselors.

28   (See, e.g., 12/7/21 Tr. 32:1-19, 42:1-18 [Pattenaude]; 12/14/21 Tr. 89:6-8, 123:7-18 [Johnson].)

31

1    student's balance]; with *Rob-Mac, supra*, 148 Cal.App.3d at p. 799 [defendant liable who

2    refunded purchaser's money in only one of seven sales]).

**B.    Defendants' Written Disclaimers Cannot Cure the Deception in Their Phone Calls, Legally or Factually.**

The fact that Defendants' enrollment agreements (over 30 pages, see, e.g., Ex. 166),

academic catalogs (over 300 pages, see, e.g., Ex. 9043), website (30,000 pages, 12/8/21 Tr.

173:8-11 [Curran]), or other written materials may contain truthful information about Ashford

does not immunize Defendants for their misrepresentations over the phone. The first reason is

legal: under California law, a deceptive statement cannot be cured by separate disclosures. (See

*Prata, supra*, 91 Cal.App.4th at p. 1145; *Chern, supra*, 15 Cal.3d at p. 876 [accurate written

disclosures do not cure misleading quotes made in initial dealings with customers]; *Chapman v.

Skype Inc.* (2013) 220 Cal.App.4th 217, 227-28 [fine-print disclosures about plan limits in a

footnote do not, as a matter of law, cure characterization of phone plan elsewhere on website as

"unlimited"].) The law requires honesty in all consumer interactions, not just in fine print. (*Brady,

supra*, 26 Cal.App. 5th at p. 1172.) This maxim applies just as forcefully to agreements signed by

students as it does to Ashford's website. And if Defendants' oral misrepresentations cannot be

undone by their written disclaimers, they also cannot be undone by sources a student may

encounter separate from Defendants. For that reason, the Court gives no weight to Dr. Wind's

opinion that students are "active consumer[s] . . . doing searches . . . talking with friends . . . [and]

competitors." (See 12/13/21 Tr. 171:16-19 [Wind].) Moreover, as Defendants' own witnesses

admitted, students are entitled to trust their counselors. (Ex. 3743, Tr. 104:18-21 [Clark]; 12/7/21

Tr. 49:5-9 [Pattenaude]; 12/9/21 Tr. 182:7-16 [Nettles]; Ex. 3754, Tr. 26:15-26:19 [Scheie].)

The second reason is factual. In over a dozen calls, Dr. Lucido identified Ashford

admissions counselors discouraging students from reviewing Ashford's catalogs with statements

like, "Don't click it. Let me tell you why you don't click it right now. The catalog is almost 300

pages." (11/15/21 Tr. 88:21-89:27 [Lucido]; Ex. 3248; see also Ex. 807 [template email sent by

Stewart stating, "The seventh section is a link to our university catalog. There is no need to

download it, it's over 300 pages."].) As Eric Dean testified, his manager instructed him to "spit

<div align="center">32</div>

1   []out" financial information in the enrollment agreement as fast as possible. (11/9/21 Tr. 62:11-

2   63:8 [Dean]; Ex. 3681.) These practices leave students more reliant on their counselors. (11/15/21

3   Tr. 87:17-25 [Lucido].) Indeed, multiple students testified that they did not read the enrollment

4   agreement or catalog carefully if at all, instead trusting the information already provided by their

5   counselor. (See, e.g., 11/30/21 Tr. 84:23-86:6 [Embry]; Ex. 3771, Tr. 19:1-6, 24:1-15 [Ohland];

6   11/18/21 Tr. 44:6-8, 44:16-45:9 [Roberts].) Others raised concerns about the fine print only to be

7   reassured and further misled. (See 11/8/21 Tr. 140:9-141:19 [Tomko testifying she asked

8   counselor about licensure disclaimer and was told, "there would be no issue."].)

9        Furthermore, even if disclosures on Defendants' website were pertinent to

10  misrepresentations made over the phone, generalized testimony that counselors received website

11  training (12/1/21 Tr. 199:12-200:5 [McKinley]), and can provide a "tour" of "all of the different

12  things about the school" (11/10/21 Tr. 140:6-19 [Parenti]) is vague and entitled to little weight.

13  While Defendants also introduced evidence of the "net price calculator" and program costs on

14  their website, (Ex. 7740.23524-25; Ex. 7740.27075), those disclosures are not only legally

15  irrelevant to misstatements of cost over the phone, but Defendants also did not show that they

16  were part of the "tour" or meaningfully highlighted for students. There is also evidence that

17  portions of Defendants' website itself were misleading. For example, Dr. Tony Farrell agreed that

18  the only credentialing disclosure on the College of Education's website landing page was

19  embedded within the "Special Terms and Conditions" section, which a student would have to

20  affirmatively open in order to view. (Ex. 1047 & 12/9/21 Tr. 66:22-67:13 [Farrell]; see also Ex.

21  7740.01826-01830 [Ashford webpage stating that "[t]hrough the program's courses, students will

22  be able to focus on . . . social work"]; 12/8/21 Tr. 209:24-210:4 [Curran]; see discussion of EFIP

23  tool in Part VI.C.3, *infra*.) Other disclaimers, like emails Defendants sent to students about

24  teacher licensure requirements *after* the students had already earned 30, 60, or 90 credits, (12/9/21

25  Tr. 30:6-31:25 [Farrell]; Exs. 175-177; 11/8/21 Tr. 182:6-183:7 [Tomko]), would not help a

26  student make an informed decision about whether to choose Ashford in the first place.

27

28

<center>33</center>

1     The evidence clearly shows that students were misled through their phone calls with

2 admissions counselors *despite* any written disclaimers.[25]

3     **C.**    **Third Party Assessments Do Not Defeat Liability.**

4     Defendants presented evidence that they had achieved regional accreditation, and faced

5 oversight through settlements reached with the Iowa Attorney General and the Consumer

6 Financial Protection Bureau. The Court concludes that this third-party evidence does not

7 outweigh the People's direct evidence of misrepresentations.

8       **1.**    **Regional Accreditation by WASC Does Not Constitute Blanket**

9            **Approval of Defendants' Admissions Practices.**

    Defendants assert that Ashford's accreditation by the regional accreditor WASC Senior

10 College and University Commission (WSCUC or, more commonly, "WASC") weighs against a

11 finding of liability because WASC's accreditation process would have uncovered the

12 misrepresentations at issue in this case. The evidence does not support Defendants' argument.

13 Defendants did not present testimony from any WASC officials or reviewers, so there is no

14 evidence from which to conclude that the accreditor in fact sought to uncover or would have

15 uncovered the misrepresentations in this case when they accredited Ashford. While Defendants

16 provided a small number of admissions calls to WASC in 2019 (Ex. 7539.00051), there is no

17 evidence regarding how WASC chose the calls or what standard WASC used to review them.

18 And Patricia Ogden, Defendants' former Vice President for Accreditation Services, testified that

19 before 2019, Defendants never provided any admissions calls to WASC. (12/7/21 Tr. 84:11-23,

20 168:5-8 [Ogden].) The Court disagrees that WASC's accreditation implies an approval of

21 Ashford's admissions practices, particularly since WASC continued accrediting Ashford after

22 repeatedly expressing disapproval of its graduation and retention rates from 2012 through 2021.

23 (Ex. 929; Exs. 7529, 7537 & 12/7/21 Tr. 160:15-164:23 [Ogden]; Exs. 7539, 7768 & 12/7/21 Tr.

24

25      [25] The Court gives little weight to Dr. Wind's student survey, which he contended showed that "only" 2-5% of Ashford's students felt deceived. (See 12/13/21 Tr. 176:4-10 [Wind].) Dr. Wind's survey had an extremely low

26 response rate of 0.4% and intentionally excluded, among other groups, students aware of litigation against Defendants. (12/13/21 Tr. 204:19-22, 210:3-7, 210:24-211:17 [Wind].) These flaws signal bias in the survey results,

27 and Dr. Wind did not perform any analysis of non-responders to refute the likelihood of bias. (12/13/21 Tr. 215:6-9 [Wind].) Moreover, Dr. Wind's survey showed that 24.1% of students reported that an advisor's promise was key to

28 their decision to attend Ashford. (12/13/21 Tr. 215:18-22 [Wind].)

34

171:14-174:12 [Ogden]; 12/7/21 Tr. 175:26-176:13 [Ogden].) Moreover, any WASC approval of Defendants' admissions practices would be vastly outweighed by the actual evidence of misrepresentations the Court found here and the Court declines to substitute WASC's judgment for its own.

2. **The Iowa Settlement Was Limited, the Monitor's Findings Are Contradicted by the People's Evidence, and Neither Bar Liability.**

Defendants presented evidence of the work of attorney Thomas Perrelli, the third-party monitor who assessed Defendants' compliance with their settlement with the state of Iowa, regarding Iowa's false advertising allegations. Defendants emphasize that Mr. Perrelli examined their business practices, including their phone calls, and found no "pattern or practice" of misrepresentations. (Ex. 3750, Tr. 49:6-8 [Perrelli].) But Mr. Perrelli's assessments do not defeat liability for several reasons. First, Mr. Perrelli's monitorship lasted only from May 2014 to May 2017 (Ex. 3750, Tr. 201:1-202:12 [Perrelli]), whereas this case ranges from 2009 to 2021. Second, Mr. Perrelli did not investigate the same range of misrepresentations that the People have proven in this case. (See, e.g., Ex. 3750, Tr. 301:11-302:12, 311:5-312:4, 325:6-13 [Perrelli].) Third, even as to the misrepresentations that were on his radar, Mr. Perrelli's summary conclusion of no "pattern or practice" could not be tested at trial. Mr. Perrelli's call review was done primarily by junior associates at his law firm without the guidance of a statistician, and his reports do not contain the underlying calls or data they reviewed. (Ex. 3750, Tr. 28:20-21, 215:21-217:3, 219:9-17 [Perrelli].) The People presented evidence of a rigorous call review conducted by a college admissions expert, Dr. Lucido, along with the testimony of a statistician, Dr. Bernard Siskin, to quantify the ramifications of Dr. Lucido's findings. Dr. Lucido's and Dr. Siskin's analyses are detailed and transparent, and deserve greater weight than Mr. Perrelli's. Indeed, they show that Defendants engaged in substantial rates of misrepresentations both during and after Mr. Perrelli's tenure. (See Part VII.A.2, *infra*.) Fourth, Mr. Perrelli's own reports contain observations that corroborate the People's case, such as Defendants' tolerance for "repeat or severe compliance infractions." (Ex. 3750, Tr. 318:6-319:15 [Perrelli]; Ex. 1154.0015 [2016 Report]; Ex. 1155.0051 [2017 Report].) Finally, while Mr. Perrelli opined about the admissions floor environment based

35

1   on his occasional visits, the more reliable evidence on that issue is testimony from those with

2   first-hand experience: Defendants' own admissions employees. (See Part III.B, *supra*.) Thus, the

3   Court, which is charged with independently evaluating the People's claims and evidence

4   supporting them at trial, finds that Mr. Perrelli's conclusions do not bar liability. However, the

5   Court will give some weight to Mr. Perrelli's conclusions when evaluating the appropriate

6   statutory penalties for any violations.

7               **3.    Defendants' Settlement with the CFPB is Not a Defense.**

8        Nor does Defendants' settlement with the Consumer Financial Protection Bureau ("CFPB")

9   provide a defense here. That settlement involved alleged violations of federal law relating to

10  private loans that Zovio made to students which are not at issue in this case. (Ex. 1078 [CFPB

11  Consent Order] [requiring $23 million in restitution for private loan payments].)

12       Defendants did elicit testimony that, under the CFPB settlement, they implemented the

13  "EFIP" tool, developed by the CFPB, which walks Ashford students through financial

14  information relating to their degree. (Tr. 12/8/21 Tr. 10:4-13:21 [Smith].) However, as explained

15  in Part VI.B, *supra*, misleading statements by admissions counselors regarding financial aid and

16  cost of attendance cannot be cured by written disclaimers like those contained in the EFIP. More

17  practically, the EFIP tool lacks information on many cost issues raised in the People's case,

18  including: the costs of doubling up, lifetime limits on federal grants and loans, and any

19  comparative costs between Ashford and other schools. (Ex. 7798 & 12/8/21 Tr. 101:8-102:13

20  [Smith].) Finally, the EFIP tool understates the cost of completing an Ashford degree by 20% by

21  using four academic years, when in fact it takes five. (12/8/21 Tr. 76:5-18 [Smith]; Ex. 7798.)

22          **D.    There Is No Good Faith Defense to Liability, and Regardless, Defendants
                    Did Not Demonstrate Good Faith.**

23
         Equitable defenses such as good faith cannot defeat UCL liability and are only relevant to

24  fashioning an appropriate equitable remedy. (See *Cortez v. Purolator Prods. Co.* (2000) 23

25  Cal.4th 163, 179-181.) Further, the existence of a compliance program does not in itself establish

26  good faith. In fact, the court in *JTH Tax* held that a defendant can violate the UCL and FAL even

27  when its own internal policies forbid the false advertisements in question, if the defendant

28                                                   36

1   nonetheless fails to stop false advertisements after it becomes aware of them. (See *JTH Tax*,

2   *supra*, 212 Cal.App.4th at pp. 1247-1249.) Here, it is clear that Defendants did not take serious

3   action to prevent or remedy the extensive deception their compliance program identified. (See

4   Part V.B [Defendants' Knowledge] and Part V.C [Defendants' Failure to Act], *supra*.) To be

5   clear, Defendants are not being punished for having a compliance department, but for the actual

6   misleading practices their employees engaged in, and for their failure to meaningfully respond to

7   that misconduct.

8       **E.    There is Insufficient Evidence to Support Any Remedy For The People's
              Debt Collection Claims and Demands.**

9       The People seek penalties, restitution of fees paid, and an injunction based on Zovio's

10  debt collection practices that lasted from March 2008 until December 19, 2013. (12/15 Tr.

11  185:21-23; Ex. 3642 at ¶ 6.) While the People argue that Zovio illegally profited by charging

12  students unlawful debt collection fees, even if the People had presented any evidence of an actual

13  legal violation, the evidence showed that Zovio almost never recovered the money students owed

14  it, and the People did not present any calculation to support the remedies or relief sought.

15      First, the fee was not a source of profit for Zovio. The collection fee was approved as a

16  pass-through cost so that Zovio "would be made whole" on the student's debt owed, not so that

17  Zovio would receive any sort of payment above what it was owed. (Ex. 3758, Tr. 180:12-14,

18  194:21-195:1 [Moore].) Students were asked to pay the debt that was owed to Zovio, as well as

19  the collection fee that Zovio incurred due to the student's failure to timely pay, as a pass-through

20  charge. (Ex. 3758, Tr. 183:6-17 [Moore].) Zovio did not "pad[] their bottom line" or generate

21  increased profit by charging students debt collection fees, but added the 33.33% fee only so Zovio

22  could collect the full amount of debt, accounting for the collection agency's commission rate.

23  (12/15 Tr. 9:9-11; Ex. 3758, Tr. 194:15-195:3 [Moore].)

24      In fact, very few students paid any part of their debt owed to Zovio once they were

25  assessed a debt collection fee (4,413 students between March 1, 2009 and September 30, 2014),

26  and very few of those students paid (472) their entire balance. (Ex. 3642 at ¶¶ 9, 10.) This does

27  not amount to a practice warranting penalties because, aside from the 472 students who paid their

28

                                         37

1   balance in full, all students paid *less* than the amount they owed to Zovio plus the fee, and most

2   students who were assessed a fee did not pay the amounts they owed Zovio at all.

3   **Second**, in signing the enrollment agreement, students agreed to pay the reasonable

4   collection costs incurred by Zovio in collecting any unpaid balance due to the Zovio on the

5   student's account. (Ex. 1122 at 9.)

6   **Third**, the record does not support the AG's requested relief. As a preliminary matter, the

7   debt collection stipulation entered into by the parties at Exhibit 3642 does not concede liability, as

8   the People attested. This stipulation cannot be used to establish a penalty violation count,

9   especially where no student testified in this case that they paid a collection fee in response to an

10  allegedly unlawful debt collection letter. As to an injunction, Zovio voluntarily ceased the debt

11  collection practices in 2013. (Ex. 3758, Tr. 179:13-16, 187:1-23 [Moore].) There is therefore no

12  evidentiary support in the record that an injunction is warranted. The evidence showed that all but

13  472 of the students who were assessed a debt collection fee did not pay Zovio the amount they

14  owed Zovio.

15  **VII. REMEDIES**

16      **A.    Penalties**

17          **1.    Standard and Methodology for Calculating Penalties**

18  Every act of deceptive marketing in violation of both the UCL and FAL carries a penalty of

19  up to $5,000. (Bus. & Prof. Code, §§ 17206, 17536.) Civil penalties are crucial to UCL and FAL

20  enforcement because "some deterrent beyond that of being subject to an injunction and being

21  required to return such ill-gotten gains is deemed necessary to deter fraudulent business

22  practices." (*People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 924.) "What constitutes

23  a violation" in a UCL and FAL action "depends on the circumstances of the case, including the

24  type of violations, the number of victims, and the repetition of the conduct constituting the

25  violation." (*People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1566.) Expert

26  testimony, circumstantial evidence, and common sense all may support a penalty request. (*JTH*

27  *Tax, supra,* 212 Cal.App.4th at pp. 1251-1255.)

28

<div align="center">38</div>

1    Here, the Court must quantify Defendants' deceptive phone marketing. To start, the Court

2 finds it appropriate to include in the violation counts each deceptive telephone call made by

3 Defendants. (E.g., *People v. Morse* (1993) 21 Cal.App.4th 259, 273-274 [each deceptive mailing

4 is a separate violation].) In light of the enormous scope of Defendants' call marketing, the People

5 presented the expert testimony of Dr. Lucido, Dr. Siskin, and Mr. Regan, which together support

6 a reasonable inference that Defendants committed well over 75,000 violations in California, and

7 over one million nationwide. Individualized proof of deception is not required to assess penalties

8 for these deceptive calls. (*Day*, *supra*, 63 Cal.App.4th at p. 332.).Indeed, in complex cases

9 involving numerous communications, requiring individualized proof of viewership for each

10 communication would be "so onerous as to undermine the effectiveness of the civil monetary

11 penalty as an enforcement tool." (*JTH Tax*, *supra*, 212 Cal.App.4th at p. 1254 [internal citations

12 omitted].) Therefore, whether or not students who heard misrepresentations were actually

13 deceived is not relevant to determining the number of violations.

14    Furthermore, the Court finds it appropriate to reach a violation count based on the scientific

15 sampling and extrapolation conducted by the People's expert, statistician Dr. Bernard Siskin.

16 "The essence of the science of inferential statistics is that one may confidently draw inferences

17 about the whole from a representative sample of the whole," and it is a science that has "long

18 been recognized by the courts." (*In re Chevron U.S.A., Inc.* (5th Cir. 1997) 109 F.3d 1016, 1019–

19 1020 [citing statistical sampling cases]; see also *Tyson Foods, Inc. v. Bouaphakeo* (2016) 577

20 U.S. 442, 454–455 ["In many cases, a representative sample is 'the only practicable means to

21 collect and present relevant data' establishing a defendant's liability."] [internal citation

22 omitted]); *Michigan Dept. of Educ. v. U.S. Dept. of Educ.* (6th Cir. 1989) 875 F.2d 1196, 1205-

23 1206; *U.S. v. Life Care Centers of Am., Inc.* (E.D. Tenn. 2014) 114 F.Supp.3d 549, 559-560.) "If

24 sampling is used to estimate the extent of a party's liability, care must be taken to ensure that the

25 methodology produces reliable results. With input from the parties' experts, the court must

26 determine that a chosen sample size is statistically appropriate and capable of producing valid

27 results within a reasonable margin of error." (*Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1,

28 42.) Here, Dr. Siskin's calculations of the number of misleading phone calls made by Defendants

39

1  are sound: they are based on a sufficiently large random sample, and associated with small

2  margins of error at a 95% confidence level.

3       **2.    Penalty Counts for California Phone Calls, 2013-2020**

4       The People established the number of deceptive calls based on a transparent, three-step

5  analysis performed by Dr. Siskin and Dr. Lucido, each according to his respective expertise. First,

6  Dr. Siskin selected a random sample of 2,234 phone calls from a total population of 1,573,400

7  calls between Defendants and their California students between 2013 and 2020. (11/29/21 Tr.

8  21:13-19, 26:15-27:15 [Siskin].)[26] Due to Defendants' call retention practices, the population

9  available for sampling consisted of calls from many student-facing departments, not just

10  admissions. (Ex. 1442.0004.) To segregate a representative sample of only the type of calls the

11  People alleged contained misrepresentations—that is, calls by admissions employees discussing

12  the Relevant Topics—Dr. Siskin utilized objective data coded by a document review firm that

13  reviewed the 2,234-call random sample. (11/29/21 Tr. 22:16-23:14 [Siskin].) That data allowed

14  Dr. Siskin to sort the sample into two groups: 1) admissions calls discussing at least one Relevant

15  Topic,[27] and 2) all other calls (which were assumed not to contain any misrepresentations, and

16  therefore were excluded from all violation counts). (11/29/21 Tr. 22:20-27 [Siskin].)[28] There were

17  561 calls in the first group ("Relevant Calls"), and 1,673 calls in the second group. (11/29/21 Tr.

18  23:15-21 [Siskin].)

19       [26] More precisely, Defendants produced a random sample of 39,335 calls from the total population of

20  1,573,4000 calls, and Dr. Siskin drew a random sample of 2,234 calls from the sample Defendants produced—still a random sample of the total population. (11/29/21 Tr. 36:4-37:3 [Siskin].) While Defendants took issue with the extent of pre-trial disclosures about the technical steps in Dr. Siskin's random selection process, the Court finds his

21  testimony regarding selection thorough and credible. (See 11/29/21 Tr. 135:20-142:2, 176:13-180:22 [Siskin].)

22       [27] As Dr. Siskin explained, it is common for counsel to provide parameters for a statistical study. (11/29/21 Tr. 45:5-46:28 [Siskin].) The Court finds that, contrary to Defendants' arguments, the People's counsel's role did not

23  bias the analysis, but enabled a more meaningful analysis of the data; namely, how often the *admissions* department made misrepresentations.

24       [28] Defendants' attacks on the coding process lack merit. Any errors in the review firm's coding, or Dr. Siskin's sorting process, could only result in an undercount of the number of calls with misrepresentations. (11/29/21

25  Tr. 59:1-6 [Siskin].) For example, if a call that was not from the admissions department and/or did not discuss a Relevant Topic was mistakenly sent to Dr. Lucido for review, Dr. Lucido would not have identified a

26  misrepresentation in it, since he was tasked with excluding non-admissions calls, and tabulated only misrepresentations about the Relevant Topics. (11/29/21 Tr. 56:23-57:27 [Siskin].) Indeed, 7 such calls were

27  mistakenly sent to Dr. Lucido, who identified no misrepresentations in them. (11/29/21 Tr. 64:3-11 [Siskin].) Conversely, if a mistake prevented a call from being sent to Dr. Lucido for review, Dr. Lucido could not have identified it as containing a misrepresentation. (11/29/21 Tr. 58:3-28 [Siskin].)

28       40

1    Second, the 561 Relevant Calls were sent to Dr. Lucido,[29] an expert in higher education

2    admissions with over four decades of experience leading admissions offices at major institutions

3    across the country. (11/29/21 Tr. 37:9-15 [Siskin]; 11/15/21 Tr. 53:26-54:13, 60:21-61:8, 61:18-

4    62:5 [Lucido].) Dr. Lucido's credible testimony regarding what is likely to deceive prospective

5    students is based on his substantial experience, and there is no evidence in the record to show that

6    Dr. Lucido's knowledge of the study's sponsor biased the results. (11/15/21 Tr. 221:13-222:7

7    [testifying that decades advising students informed his opinion about which calls were likely to

8    mislead]; 11/15/21 Tr. 198:5-21 [testifying that he conducted his work "independently"].) Of the

9    561 Relevant Calls, Dr. Lucido identified 126 calls (22%) with at least one misrepresentation.[30]

10   (Ex. 3728 [Appendix F].) For each call, Dr. Lucido reviewed the entire call in context,

11   highlighted the key passages containing misrepresentations, assigned each misrepresentation a

12   category code, and noted his rationale.[31] (11/15/21 Tr. 93:13-95:8, 190:1-191:16 [Lucido]; Ex.

13   1495 [Appendix E, full notated transcripts of all calls containing misrepresentations].)

14   Defendants' critique that Dr. Lucido deemed some statements to be misleading half-truths

15   because they "omitted critically important information," (11/15/21 Tr. 220:25-221:5 [Lucido]),

16   lacks merit because that type of statement is clearly actionable under the UCL. (See *Day, supra,*

17   63 Cal.App.4th at pp. 332-333 ["A perfectly true statement couched in such a manner that it is

18   likely to mislead or deceive the consumer, such as by failure to disclose other relevant

19   information, is actionable . . . "].) The fact that Dr. Lucido did not consider written disclaimers or

20   subsequent phone calls, (11/15/21 Tr. 210:22-211:7, 261:2-12 [Lucido]), is also beside the point

21   because the law is clear that they cannot cure the misrepresentations Dr. Lucido identified. (See

22

23   [29] As Dr. Lucido testified, his research associate, Dr. Emily Chung, initially reviewed each call to determine
     whether there was a potential misrepresentation. (11/15/21 Tr. 93:7-23 [Lucido].) If so, Dr. Chung elevated the call to

24   Dr. Lucido, who then reviewed the entire call to make the final determination. (11/15/21 Tr. 93:24-94:17 [Lucido].)
     The Court credits Dr. Lucido's testimony that no conflict resolution process was necessary because the ultimate

25   decisions were his alone. (11/15/21 Tr. 235:6-21 [Lucido]; 11/16/21 Tr. 112:19-113:5 [Lucido].)
     [30] The fact that, without his notes, Dr. Lucido did not recall the details of every call in the over 4,000 pages

26   he reviewed is unremarkable and does not undermine Dr. Lucido's credibility. He easily testified to each call once
     provided his notes. (11/16/21 Tr. 116:5-125:18 [Lucido].)

27   [31] Although Dr. Lucido separately recorded a note for every misrepresentation within every call, he also
     testified that, among the calls in each misrepresentation category, his rationale for finding the passage deceptive was

28   essentially the same. (11/16/21 Tr. 109:9-26 [Lucido]; e.g., 11/15/21 Tr. 111:7-23 [Lucido] [teaching
     misrepresentations were identified for similar reasons].)

                                                         41

1    Part VI.B, *supra*.) To the extent an admissions counselor provided both misleading and correct

2    information within the same call, Dr. Lucido assessed each call individually to determine whether

3    the advisor clearly "walked back" the misrepresentation, in which case he did not code the

4    statement. (11/15/21 Tr. 258:25-259:24 [Lucido].) The Court finds Dr. Lucido's approach more

5    logical than that of Dr. Wind, whose call review used a formula by which clear

6    misrepresentations could be cancelled out by vague disclaimers. (E.g., 12/13/21 Tr. 241:11-18

7    [Wind] ["Q. And so [if] the admissions counselor told a student that coursework or a degree from

8    Ashford was all they would need to become a teacher, but they also stated that the student should

9    check with their state licensing board for specific details, [the coders'] instructions were to

10   conclude that . . . that call was not deceptive, true? A. Yes."].) In general, the Court gives Dr.

11   Wind's call review little weight due to that flaw, as well as his lack of substantive expertise,

12   which the Court found hampered his ability to identify misrepresentations. (E.g., 12/13/21 Tr.

13   223:16-226:17 [Wind testifying to no financial aid, registrar, or teacher certification

14   experience].)[32]

15       Third, using Dr. Lucido's results, Dr. Siskin determined the best estimate of the total

16   number of misleading calls in the population: 88,742. (11/29/21 Tr. 24:20-25:2 [Siskin].) Because

17   Dr. Siskin randomly sampled 1 out of every 704.29 calls in the population (2,234/1,573,400), for

18   each one of the 126 deceptive calls that Dr. Lucido identified there were 703.29 more in the

19   population. Thus, Dr. Siskin's best estimate of the total number of misleading calls was 704.29

20   multiplied by 126: 88,742. (11/29/21 Tr. 53:9-54:26, 78:3-10 [Siskin].)

21       Further, the size of Dr. Siskin's sample resulted in small margins of error, which, when

22   paired with a high confidence level, signifies high accuracy.[33] Dr. Siskin determined with 95%

23   confidence that the true number of calls with at least one misrepresentation is between 75,097 and

24       [32] Nor did Dr. Wind provide his coders with truthful information essential to identifying misrepresentations,
such as Ashford's costs. (12/13/21 Tr. 233:1-234:6, 236:3-10 [Wind].)

25       [33] When determining the size of the random sample he would draw at the outset, Dr. Siskin considered
predictions of the rate of relevant and deceptive calls provided by the People, and a desired margin of error.

26   (11/29/21 Tr. 30:17-35:26, 69:21-70:9 [Siskin].) The predictions did not bias the analysis because if they were
wrong, the effect might simply be larger margins of error than desired, in which case Dr. Siskin would have added

27   randomly selected calls to the analysis until the desired margin of error was reached. (11/29/21 Tr. 130:28-134:11
[Siskin].) The People's predictions at the outset had no impact on the final best estimates of the number or rate of

28   misleading calls. (11/29/21 Tr. 205:26-207:5 [Siskin].)

42

1  102,386, and that the true percentage of misleading calls among Relevant Calls is between 19%

2  and 25% (a 3% margin of error). (11/29/21 Tr. 64:17-65:4, 68:17-39:7 [Siskin].) The odds that

3  the true number and rate of misleading calls lie outside of these ranges are negligible to

4  infinitesimal—for example, the chance that the true percentage of misleading calls is only 15% or

5  lower is 37 in a million. (11/29/21 Tr. 71:2-73:4 [Siskin].) Dr. Siskin also determined that the

6  percentage of misleading calls was relatively constant over the 2013-2020 period: 25% during the

7  pre-Iowa monitoring period (29 misleading calls out of 117 Relevant Calls), 23% during the

8  monitoring period (71/308), and 19% after the monitoring period (26/136), differences that Dr.

9  Siskin concluded were not statistically significant. (11/29/21 Tr. 76:2-27 [Siskin]; Appendix A.)

10       **3.    Penalty Counts for California Phone Calls, 2009-2012**

11       Because Defendants did not produce phone calls from March 2009 through December

12  2012, (Ex. 1442.0003-4), Dr. Siskin assumed that during that time, Defendants made calls to

13  California students at the same average monthly volumes, and with the same percentage of

14  misrepresentations, as reflected in his random sample. (11/29/21 Tr. 83:13-85:11 [Siskin].)

15  Accordingly, since Defendants made 88,742 misleading calls over the 88-month period January

16  2013 to April 2020 (1,008 misleading calls/month), Defendants made another 46,386 misleading

17  phone calls during the 2009 through 2012 period. (11/29/21 Tr. 84:27-85:3 [Siskin].)

18       **4.    Total Penalty Counts for Nationwide Phone Calls, 2009-2020**

19       Defendants retained and produced only California calls. The People presented evidence that

20  California students constituted 10.87%[34] of Ashford's enrollment, and Defendants offered no

21  contrary evidence. (Ex. 1387-B.) Accordingly, to calculate the number of deceptive calls

22  nationwide, one divides the number of deceptive California calls by 10.87%. (11/29/21 Tr. 85:15-

23  87:26 [Siskin].) The Court therefore finds that Defendants made a total of 1,243,099 misleading

24  calls, as detailed in Appendix A. These results converge with Defendants' own compliance data,

25

26

27     [34] The People also presented, as an alternative for Defendants' California enrollment, data from the U.S. census showing that California residents comprise 12.74% of the U.S. population ages 18-50. (Ex. 3410; 11/29/21 Tr. 88:11-89:22, 91:19-22 [Siskin].)

28

<center>43</center>

1    which show that counselors made relevant non-compliant statements 749,981 times nationwide

2    between 2013-2020, based on a 20.5% non-compliance rate. (12/2/21 Tr. 16:11-20 [Regan].)

3        The Court finds it appropriate to determine violations on a nationwide basis according to

4    the well-established rule[35] that the UCL extends to conduct that emanates from California even if

5    victims reside out of state. (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 241-

6    244; see also *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1208 ["[T]he UCL reaches any

7    unlawful business act [] committed in California."]; *Clothesrigger, Inc. v. GTE Corp.* (1987) 191

8    Cal.App.3d 605, 613 [endorsing application of California law to non-resident victims].)

9        For the vast majority of the statutory period, Defendants' misconduct emanated from

10   California. As its accreditor WASC summarized, Defendants' San Diego headquarters "houses its

11   extensive online operation and is the home base for [their] leadership team and the vast majority

12   of its faculty and staff." (Ex. 7529.0002; see also 12/6/21 Tr. 227:2-8 [Pattenaude].) Numerous

13   employees, from admissions counselors to Ashford's former presidents, testified they worked in

14   San Diego, where Defendants are headquartered. (See, e.g., 11/9/21 Tr. 13:18-20 [Dean];

15   11/10/21 Tr. 82:4-10 [Parenti]; 12/1/21 Tr. 131:11-15 [McKinley]; 12/7/21 Tr. 43:8-11

16   [Pattenaude]; 12/7/21 Tr. 205:14-26 [Smith]; 12/9/21 Tr. 68:9-13 [Farrell]; 12/9/21 Tr. 159:7-14

17   [Nettles]; 12/13/21 Tr. 28:8-17 [Chappell]; 12/14/21 Tr. 56:17-24 [Johnson]; 12/14/21 Tr. 192:6-

18   8 [Swenson]; see also 12/9/21 Tr. 68:14-23 [Farrell].) In fact, the majority of admissions

19   employees were located in San Diego. (See, e.g., Ex. 1379.0002 [reporting monthly headcounts

20   of admissions employees in 2014 and 2015]; Ex. 3743, Tr. 64:17-65:66:3 [Clark discussing Ex.

21   1379]; 11/10/21 Tr. 82:11-14 [Parenti testifying most admissions staff were based in San Diego

22   from 2007 to 2016].) Moreover, Defendants' admissions counselors were trained to speak to

23   students the same way regardless of where students lived. (See 11/10/21 Tr. 56:28-58:10

24   [Parenti]; see also Ex. 3749, Tr. 169:19-170:1 [Chappell testifying operations compliance

25   department didn't perform state-specific functions].) Although Defendants moved their

26   headquarters to Arizona in 2019, many top executives are still based in San Diego, (see 11/10/21

27        [35] The constitutional and choice-of-law issues raised by nationwide remedies were briefed fully by the
     parties via Defendants' Motion in Limine #6, which the Court denied. (ROA #531 [motion]; ROA #574 [opposition];
28   12/2/21 Tr. 8:20-9:8 [ruling].) The Court notes that this holding applies only to the deceptive call violation counts.

44

1   Tr. 82:26-83:16 [Parenti testifying admissions and compliance executives are based in San

2   Diego], 84:1-3 [Ashford president was based in San Diego as recently as 2020], 84:4-9 [Parenti

3   based in San Diego]; 12/13/21 Tr. 29:6-24 [Chappell testifying Zovio general counsel was based

4   in San Diego until retirement in 2021]), and Defendants continue to employ admissions

5   counselors and compliance staff in San Diego, (see Ex. 3737.0092; 11/10/21 Tr. 82:15-18

6   [Parenti testifying Zovio still employs admissions staff in San Diego], 87:5-8 [San Diego-based

7   admissions counselors were hired in November 2020]; 12/13/21 Tr. 31:22-24 [Chappell testifying

8   compliance staff is based in San Diego]). Given these facts, both constitutional and choice-of-law

9   principles support an award of penalties based on deception of students nationwide.

10        **5.   The Statutory Penalty Factors.**

11       The Court's "duty to impose a penalty for each violation [of the UCL and FAL] . . . is

12   mandatory." (*People v. Custom Craft Carpets, Inc.* (1984) 159 Cal.App.3d 676, 686 [citation

13   omitted].) "The amount of each penalty, however, lies within the court's discretion." (*Ibid.*) In

14   exercising that discretion, the Court "shall consider any one or more" of the following non-

15   exhaustive factors set out in both the UCL and FAL: "the nature and seriousness of the

16   misconduct, the number of violations, the persistence of the misconduct, the length of time over

17   which the misconduct occurred, the willfulness of the defendant's misconduct, and the

18   defendant's assets, liabilities, and net worth." (Bus. & Prof. Code, §§ 17206, subd. (b), 17536,

19   subd. (b).) The Court has considered the factors and determined that $22,375,782.00 in statutory

20   penalties is reasonable and supported by the evidence.

21       The Court assessed the penalty amounts based on its careful consideration of the entire

22   record. The Court finds that Defendants made false and misleading statements to students over a

23   substantial period of time. But the Defendants also dedicated significant time and efforts in

24   creating a compliance program to detect and prevent fake and misleading statements. Even if

25   insufficient to pose a bar to liability, Thomas J. Perrelli's work as the independent administrator

26   of the Assurance of Voluntary Compliance entered in May 2014, between Defendants and Iowa,

27   weighs favorably for Defendants. Also, the Consent Order with the Consumer Financial

28   Protection Bureau that Defendants entered in September 2016, weighs favorably for the

<div align="center">45</div>

1　　Defendants. For example, while the record has demonstrated that it is not perfect nor a cure for

2　　Defendants' misrepresentations (see, e.g., Part VI.C.3, *supra*), the EFIP tool implemented as a

3　　result of the Consent Order walks Ashford students through at least some of the financial

4　　information relating to their degree. These elements warranted a downward adjustment in the

5　　total amount of penalties.

6　　　　　　**6.　No Injunction Is Necessary**

7　　　　　The evidence at trial demonstrated that there is no basis to impose an injunction on Zovio.

8　　The People have not presented sufficient evidence of ongoing misconduct to support its demand

9　　for an injunction. The court does not find the evidence postdating 2017 to be such that an

10　　injunction is needed. For example, no student who enrolled after 2017 or admissions counselor

11　　who worked after 2017 testified. The People's expert analysis ended in 2018 (Dr. Cellini), 2020

12　　(Mr. Regan), 2020 (Dr. Siskin), and 2020 (Dr. Lucido). Dr. Lucido identified only four deceptive

13　　calls in 2020 (Exs. 2397-2400), which falls far short of what is required to establish an imminent

14　　threat of misconduct entitling the People to an injunction.[36] Moreover, Ashford University no

15　　longer exists, and Zovio no longer serves the role it did previously; it now provides support

16　　services subject to the direction of UAGC—a non-profit entity. (Ex. 1320.) The People did not

17　　introduce evidence of Zovio's current practices—how it trains admissions counselors, how it

18　　monitors admissions counselors, or how it administers financial aid.

19　　　　　To argue that purported misconduct continues to the present, the People cited only a single

20　　email from corporate compliance director Emiko Abe from 2021 describing one exit interview,

21　　but that email cannot justify an injunction. Ms. Abe credibly testified that during her entire time

22　　monitoring exit interviews, she only saw one exit interview that mentioned feeling pressure. (Ex.

23　　3759, Tr. 81:25-82:4; 85:23-25; 97:13-22 [Abe: "I had reviewed several in the course of my

24　　evaluation of exit interviews and do not recognize any other reports of any other concerns . . . . It

25　　is my opinion that this was an anomaly[]."].) Ms. Abe investigated the situation and determined

26　　that there was no issue remaining. (Ex. 3759, Tr. 89:16-90:6, 95:9-11 [Abe].) Ms. Abe even

27

28

---

[36] In one of those 2020 calls, (Ex. 2399), Dr. Lucido conceded that the student did not rely on the admissions counselor's alleged misrepresentation in order to enroll, and the student indicated he "felt that Ashford was more than they were willing to pay at this point in their search." (11/16 Tr. 102:18-105:13.)

46

1　attempted "several times" to follow-up with the author of the exit survey to "gain more insight

2　from him or her into what might have led to them feeling that pressure," but the former employee

3　did not respond. (Ex. 3759, Tr. 95:22-25 [Abe].) If anything, this email demonstrates that Zovio's

4　compliance department has (at least relatively recently) taken seriously signs of concerning

5　behavior. The People provided insufficient current evidence entitling it to an injunction and Zovio

6　demonstrated that it has already made many of the changes the People seek via injunction. (12/9

7　Tr. 69:18-21 [Dr. Farrell testified we followed AVC disclosure requirements on noncompliant

8　conduct. (12/9 Tr, 191:27-192:14 [Chappell].) ·

9　　　Thus, the Court finds judgment in favor of the People of the State of California for

10　$22,375,282.00 in penalties against Defendants for misleading students about career outcomes,

11　cost and financial aid, pace of degree programs, and transfer credits, in order to entice them to

12　enroll at Ashford. The Court finds judgment for the Defendants on liability as to its debt

13　collection practices and denies the People's request for penalties, restitution on fees paid and an

14　injunction based on Defendants' debt collection practices. The Court denies the People's request

15　for an injunction on Zovio.

16　**IT IS SO ORDERED.**

17

18　Dated: March 3, 2022

EDDIE C. STURGEON
Judge of the Superior Court

47

**APPENDIX A**
**PENALTY COUNTS**

48

| Period | # of Misleading Calls Identified by Dr. Lucido | | Dr. Siskin's Multiplier | | # of Misleading California Calls | | Nationwide Factor (Ex. 1387-B) | | # of Misleading Calls Nationwide |
|---|---|---|---|---|---|---|---|---|---|
| *Pre-Iowa (3/1/09-12/31/12)* | - | | - | = | 46,386 | ÷ | 10.87% | = | 426,734 |
| *Pre-Iowa[i] (1/1/13-5/14/14)* | 29 | x | 704.29 | = | 20,424 | ÷ | 10.87% | = | 187,893 |
| *Iowa Monitorship[ii] (5/15/14-5/14/17)* | 71 | x | 704.29 | = | 50,004 | ÷ | 10.87% | = | 460,018 |
| *Post-Iowa[iii] (5/15/17-4/30/20)* | 26 | x | 704.29 | = | 18,311 | ÷ | 10.87% | = | 168,454 |
| | | | | | | | **Grand Total** | = | **1,243,099** |

---

[i] 29 misleading calls in pre-Iowa monitoring period: Exs. 1514, 2261-2274, 2276-2280, 2282, 2284-2290, 2293; see also Ex. 3728 [Lucido list of misleading calls]. Other Relevant Calls in this period: Exs. 2275, 2281, 2283, 2291, 2292, 2969-3002, 3004-3052.

[ii] 71 misleading calls in monitoring period: Exs. 2294-2316, 2318-2320, 2322-2333, 2335-2344, 2346-2354, 2356-2363, 2365-2369, 2373; see also Ex. 3728 [Lucido list of misleading calls]. Other Relevant Calls in this period: Exs. 2317, 2321, 2334, 2345, 2355, 2364, 2370-2372, 3053-3246, 3248-3281.

[iii] 26 misleading calls in post-monitoring period: Exs. 2374-2382, 2384-2400; see also Ex. 3728 [Lucido list of misleading calls]. Other Relevant Calls in this period: Exs. 2383, 3282-3365, 3367-3373, 3375-3381, 3383-3387, 3389-3391, 3393-3395.

49

# **EXHIBIT B**

 Gmail            **Amy Smith <**

## Payment Plan Application
3 messages

**accountresolution@ashford.edu <accountresolution@ashford.edu>**        Mon, Jun 29, 2020 at 12:33 PM
To:

 

06/29/2020 ASHFORD UNIVERSITY PRIVATE EDUCATION LOAN APPLICATION AND SOLICITATION DISCLOSURE

CREDITOR:

Ashford University

8620 Spectrum Center Blvd.
San Diego, CA 92123

## Loan Interest Rates

| | |
|---|---|
| Your starting interest rate will be<br><br>0.000% | **Your Starting Interest Rate (upon approval)**<br><br>The interest rate you pay if you are approved for the loan will be 0.000%.<br><br>**Your Interest Rate during the life of the loan is fixed at zero percent (0.000%) and will not change during the term of your loan**<br><br>**Loan Fees**<br><br>There are no fees associated with the Payment Plan program. |

## Estimated Payment Schedule and Terms

6/23/22, 1:39 AM
Gmail - Payment Plan Application

| 35 Month Payment Plan | MONTHLY PAYMENTS  At 0.000% the interest rate on your outstanding balance | The estimated **Total of Payments** at your fixed interest rate of zero percent (0.000%) would be **$4,866.86** |
|---|---|---|
| 2017-08-10 | $139.05 | |
| 2017-09-10 | $139.05 | |
| 2017-10-10 | $139.05 | |
| 2017-11-10 | $139.05 | |
| 2017-12-10 | $139.05 | |
| 2018-01-10 | $139.05 | |
| 2018-02-10 | $139.05 | |
| 2018-03-10 | $139.05 | |
| 2018-04-10 | $139.05 | |
| 2018-05-10 | $139.05 | |
| 2018-06-10 | $139.05 | |
| 2018-07-10 | $139.05 | |
| 2018-08-10 | $139.05 | |
| 2018-09-10 | $139.05 | |
| 2018-10-10 | $139.05 | |
| 2018-11-10 | $139.05 | |
| 2018-12-10 | $139.05 | |
| 2019-01-10 | $139.05 | |
| 2019-02-10 | $139.05 | |
| 2019-03-10 | $139.05 | |
| 2019-04-10 | $139.05 | |
| 2019-05-10 | $139.05 | |
| 2019-06-10 | $139.05 | |
| 2019-07-10 | $139.05 | |
| 2019-08-10 | $139.05 | |
| 2019-09-10 | $139.05 | |
| 2019-10-10 | $139.05 | |
| 2019-11-10 | $139.05 | |
| 2019-12-10 | $139.05 | |
| 2020-01-10 | $139.05 | |
| 2020-02-10 | $139.05 | |
| 2020-03-10 | $139.05 | |
| 2020-04-10 | $139.05 | |
| 2020-05-10 | $139.05 | |
| 2020-06-10 | $139.16 | |

## Next Steps

To apply for this loan, complete the Payment Plan Approval form, sign, and return it to your Student Account Advisor via email or fax. If you are approved for this loan, the loan terms will be available for 30 calendar days. (Terms will not change during this period, except as permitted by law.) See your Payment Plan or contact your advisor for any additional information about terms of the program.

## Reference Information

### Fixed Interest Rate

- This loan has a fixed interest rate of zero percent (0.000%).
- This interest rate will remain fixed during the life of your loan.

### Eligibility Criteria

- Must be either a U.S. citizen or permanent resident.
- Must attend or have attended Ashford and have unpaid tuition balance.
- Must be the age of majority in your state of residence at the time you apply.

### Bankruptcy Limitations

- If you file for bankruptcy, you may still be required to pay back this loan.

For more information about payment plans, please see the current Payment Plan policy in the current *Ashford University Academic Catalog.*

ashford.edu

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages sent from this company may contain information that is confidential and may be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

---

**Amy Smith**                                                           Tue, Jun 30, 2020 at 12:34 PM
To: "accountresolution@ashford.edu" <accountresolution@ashford.edu>

The email addressed an application process, but there isn't any application attached.

Thank you
Amy Smith
AMSMIT6864

[Quoted text hidden]

---

**Amy Smith**                                                           Fri, Apr 29, 2022 at 12:37 AM
To: Amy Smith <

[Quoted text hidden]

# EXHIBIT C

6/29/22, 12:23 PM          Gmail - Your purchase at ASHFORD.EDU was declined:

 **Gmail**

**Amy Smith** ›

---

## Your purchase at ASHFORD.EDU was declined:
1 message

---

**Capital One** <capitalone@notification.capitalone.com>      Mon, Jun 29, 2020 at 12:09 PM
To:



Make a payment to reduce your balance.

Re: Your account ending in 3935

Your recent purchase was declined because you didn't have enough available credit. Here are the transaction details:

June 29, 2020 2:08 PM ET
ASHFORD.EDU
$1395.05

If you make a payment now, you'll lower your balance and see more available credit in 1–2 days.

Make a Payment

**Don't recognize this transaction?** Sign in to see a transaction summary.

Was this email helpful? Tell us what you think in one click.

                

Absolutely     Sure     Neutral     Not Really     Nope

Simple. Flexible. Mobile.
Download the secure Capital One Mobile app.

Important Information from Capital One®

# **<u>EXHIBIT D</u>**

6/23/22, 2:34 AM
Gmail - Your Payment has been Received

 Gmail

Amy Smith

## Your Payment has been Received

1 message

payments@ashford.edu <payments@ashford.edu>
To:

Mon, Jun 29, 2020 at 12:12 PM





Date: 06/29/2020
Receipt #:    2963
Student ID: AMSMIT6864
Student Name: Amy Smith
Program: BA

Terms and conditions, tuition, fees, and payment requirements are subject to change. Please review the Ashford University Academic Catalog for current information at www.ashford.edu/catalog. Students are responsible for keeping their account up to date with correct billing and payment information.

| Date | Payment Type | Description | Term | Payments |
|---|---|---|---|---|
| 06-29-2020 | Credit Card | Downpayment Credit Card Payment - CC | 5_2010 | $139.05 |

**STUDENT ACCOUNTS**
Ashford University

Chat with Us

ashford.edu
IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages sent from this company may contain information that is confidential and may be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

# **EXHIBIT E**

## Reference Information

### Fixed Interest Rate

- This loan has a fixed interest rate of zero percent (0.000%).
- This interest rate will remain fixed during the life of your loan.

### Eligibility Criteria

- Must be either a U.S. citizen or permanent resident.
- Must attend or have attended Ashford and have unpaid tuition balance.
- Must be the age of majority in your state of residence at the time you apply.

### Bankruptcy Limitations

- If you file for bankruptcy, you may still be required to pay back this loan.

For more information about payment plans, please see the current Payment Plan policy in the current *Ashford University Academic Catalog.*

ashford.edu

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages sent from this company may contain information that is confidential and may be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

---

**Amy Smith**                                                      Tue, Jun 30, 2020 at 12:34 PM
To: "accountresolution@ashford.edu" <accountresolution@ashford.edu>

The email addressed an application process, but there isn't any application attached.

Thank you
Amy Smith

[Quoted text hidden]

---

**Amy Smith**                                                      Fri, Apr 29, 2022 at 12:37 AM
To: Amy Smith

[Quoted text hidden]

# **EXHIBIT F**

6/23/22, 2:35 AM                                           Gmail - Ashford University / Financial Aid & Services Dept

 Gmail                                           **Amy Smith <**

# Ashford University / Financial Aid & Services Dept
2 messages

**Neal, Denise <Denise.Neal@ashford.edu>**                         Thu, Jul 2, 2020 at 5:59 PM
To:

Good Afternoon Amy,

So sorry for the delay.

I have been working with my manager on your account. Unfortunately, we are unable to get you set up on a payment plan.

Internal Collections Dept. has transferred your balance to 3rd party Collections as of 6/25/2020. My manager and I tried to have this reversed, but it was not approved. At this time, your balance will have to be paid in full for you to return.

We are unsure of the agency that will be handling your balance at this time. This information should be added to your account next week from the collections dept.

I do apologize that we weren't able to move forward with the payment plan.

**\*Please make sure to include your student ID in all email correspondence.**

Best Regards,

## DENISE NEAL / STUDENT ACCOUNTS COORDINATOR

*Ashford University / Financial Aid & Services*

||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||
**P / 800.798.0584  X / 20063**

IMPORTANT NOTICE: This e-mail message is for the sole use of the intended recipient(s) and may contain confidential information. E-mail messages sent from this company may contain information that is confidential and may be legally privileged. Any review, use, distribution, disclosure or saving of this message is strictly prohibited. If you received this transmission in error, please notify the sender by reply email and delete all copies of this message and any attachments.

**<u>EXHIBIT G</u>**

6/23/22, 2:56 AM          Gmail - Ashford University - Reentry Results! Student ID: AMSMIT6864

 Gmail             **Amy Smith <amysmith00140@gmail.com>**

## Ashford University - Reentry Results! Student ID: AMSMIT6864

2 messages

**Berg, Jaime <Jaime.Berg@ashford.edu>**          Sun, Apr 26, 2020 at 3:20 PM
To: "        " <
Cc: "Cuadros, Jennifer" <Jennifer.Cuadros@ashford.edu>, "Dulberg, David" <David.Dulberg@ashford.edu>

Hi Amy, the Ashford University Reengagement Department reviewed your reentry request, and to complete your review, please click this link to submit both your 2019/2020 FAFSA and 2020/2021 FAFSA with our school code: 001881. In 3 business days, once your FAFSA has processed, you will be able to view it in your Funding Portal for Financial Aid, located in your Student Portal. You will need to complete any additional documents listed as NEEDED in your Funding Portal to be eligible to return to Ashford University. It can take the Financial Services Department (FSD) up to 2-business days to review submitted documents and update the status. Please contact me directly once the FSD has removed your financial aid holds and flipped all your Funding Portal documents to either a SATISFIED/WAIVED status so that we can move forward with your Reentry. Here are the instructions to access your Funding Portal: Log in to your Student Portal Username: Student ID Password: One you created or click here to Reset your Student Portal Password and on the left purple navigation of your Student Portal, select My Finances > Funding Portal > Disable your pop-up blockers and Refresh the page if needed > Wait a minute for the Funding Portal link to display on the white background. Then, click the Funding Portal link and log in with the displayed Funding Portal Username: Amy.Smith6@student.ashford.edu Funding Portal Password: Student Portal Password. Select More and Action Required to view and complete all financial aid documents listed as NEEDED once your 2019/2020 FAFSA and 2020/2021 FAFSA have processed and accessible in your Funding Portal. For all Financial Aid related questions or assistance, you can contact the Financial Services Department by sending them a web portal message through your ADVISOR CENTER, located on the homepage of your Student Portal, or call directly at (866)621-9876 x20059. Please update me once your Financial Aid documents are complete.


Yes, all my documents are complete.

No, I am no longer interested in returning.


JAIME BERG, MBA / UNIVERSITY ADVISOR III

**Ashford University / Reengagement Department**


Phone: (866)621-9876 x17982

Email: Jaime.Berg@ashford.edu


IMPORTANT NOTICE: This e-mail message is for the sole use of the intended recipient(s) and may contain confidential information. E-mail messages sent from this company may contain information that is confidential and may be legally privileged. Any review, use, distribution, disclosure or saving of this message is strictly prohibited. If you received this transmission in error, please notify the sender by reply email and delete all copies of this message and any attachments.

**Amy Smith**                                          Thu, Jun 23, 2022 at 2:47 AM
To: Amy Smith <

[Quoted text hidden]

# EXHIBIT H

6/23/22, 2:27 AM                                                    Gmail - Your Student Account

# ⋈ Gmail                                                    Amy Smith <                                    >

## Your Student Account
1 message

ashford@edresolute.com <ashford@edresolute.com>                        Mon, May 11, 2020 at 12:04 PM
To:



Dear AMY SMITH,

We are reaching out to you regarding your open balance with Ashford University. We have included your
account summary below and provided options for resolving this balance.

| Student Account Number: | |
|---|---|
| Current Balance: | $5,005.91 |
| Last Date of Attendance: | 04/06/2020 |

Options:

- Online Payment with a credit card http://ashford.edresolute.com/
- Contact a consumer specialist by replying to this email or by calling 877-835-1659 to set up
  payment arrangements.

If there is an error in our billing records or you are unable to pay at this time, please contact us directly
877-835-1659, Monday-Friday between 8am-5pm or via email ashford@edresolute.com to further
discuss and make necessary arrangements for payment. We look forward to hearing from you soon.

Regards,

# **<u>EXHIBIT I</u>**

6/23/22, 2:32 AM · · · · · · · · · · · · · · · · · · · · · · · · Gmail - Access the Funding Portal

privileged. Any review, use, distribution, disclosure or saving of this message is strictly prohibited. If you received this transmission in error, please notify the sender by reply email and delete all copies of this message and any attachments.

**I Love Referrals!**
Please call me if your friends
or family would appreciate
my service.

**image005.jpg**
7K

---

Carinio, Karina <Karina.Carinio@ashford.edu>                    Thu, Jun 25, 2020 at 1:05 PM
To: "                                    " <
Cc: "Berg, Jaime" <Jaime.Berg@ashford.edu>

Hello Amy,

The collections department informed me that the account balance would have to be paid in full.  The account is currently pending agency placement, but you can contact the Student Accounts Department at 1-800-798-0584 ext 20063 to make a payment.

Thank you,

Best wishes, and please stay happy, healthy, and home during this time. ♥

**Karina Carinio** / ENROLLMENT SERVICES ADVISOR III

Ashford University / Forbes School of Business and Technology

**P/866.974.5700  X/16795 /FAX:** 877-816-8628

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**image005.jpg**
7K

6/23/22

# EXHIBIT J

6/23/22, 2:35 AM          Gmail - Ashford University / Financial Aid & Services Dept

**Amy Smith** ·       ⋗                         Wed, Jul 8, 2020 at 3:27 AM
To: "Neal, Denise" <Denise.Neal@ashford.edu>

Dear Ms. Neal,

I did receive your email that you have been working with your manager on my account. I would like to know whose job it was to send notification in writing about my debt and the consequences the balance would have to pay the debt in full before I could re enter before the debt was sold to a collection agency. I kept in contact with Ashford that I was trying to reenter and at no point did I receive notification from Ashford what the debt consisted of nor did I receive communication the debt had to be paid in full before I could re enter prior to the debt sent to a third party. I would also like to know why I wasn't offered payment arrangements before the debt was sent to a third party, in which you sent confirmation Ashford offered an interest free loan agreement when I spoke to you. You also took an installment payment of the debt. I would also like to mention while taking the installment payment you addressed Ashford wasn't responsible for funds not available before running my card. I do believe within the transaction you should have addressed, you collecting a debt for Ashford, ran my card on the first try for $1395.05 instead of the $139.05 agreed upon. I received an email from Capital One saying the amount was declined. The declined amount promoted me to call Ashford because I thought Ashford hadn't received the installment amount $139.05.

Thank you
Amy Smith

[Quoted text hidden]

# EXHIBIT K



The CBE Group, Inc.
1309 Technology Pkwy, Cedar Falls, IA 50613
8:00 a.m. - 9:00 p.m. CT Monday-Thursday
8:00 a.m. - 5:00 p.m. CT Friday

12/04/20

| | |
|---|---|
| Call: | (877)863-2161 |
| Creditor: | Ashford University |
| Account Number: | |
| CS Number: | |
| Reference Number: | |
| Total Amount Due: | $4,975.91 |

## Save On Your Balance

### Decide What Works Best For You

**Option 1**

SAVE $746.39 Off Your Balance!
Make one low payment of $4,229.52
Offer Good Through 01/03/21

**Option 2**

Pay Your Full Balance Over The Next Two Months
Make Two monthly payments totaling $4,975.91

Ready to take advantage of an offer or discuss other options?

Give us a call. We can work with you to find the best payment option.

Dear Amy Smith :

We understand getting caught up on bills isn't easy. To help, we'd like to offer you the chance to resolve your account for less than the balance owed, you can save up to $746.39 off your balance with this offer.

Please call us if you would like to take advantage of this offer or if you would like to discuss other payment options. We are committed to helping you find ways to resolve your debt.

Please note: The CBE Group, Inc. is not obligated to renew these offers.

 *Pay Online → Account resolution the easy way*
Login to your account at **www.paycbegroup.com** to quickly and easily pay your balance in full or setup payment arrangements.

**This is an attempt to collect a debt; any information obtained will be used for that purpose. This communication is from a debt collector.**

NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION.

PLEASE DETACH AND RETURN LOWER PORTION WITH ENCLOSED ENVELOPE.

PO BOX 2547
WATERLOO, IA 50704-2547
CHANGE SERVICE REQUESTED



IF PAYING BY CREDIT/DEBIT, FILL OUT BELOW

ACCT #        CS #        REF #        DATE 12/04/20

CALL: (877)863-2161

Amy Smith
7613 Berchman Dr
Dayton OH 45424-2110

THE CBE GROUP, INC.
Payment Processing Center
Po Box 2068
Waterloo, IA 50704-2068

# **EXHIBIT L**

CBE Group                                    Amy Smith
1309 Technology Pkwy                          7613 Berchman Dr
Cedar Falls, IA 50613                         Huber Heights, Ohio 45424

Date: 10/27/20

Account #:

Dear CBE Group,
    This is my third request asking for an invoice associated with this debt. I dispute the
amount CBE Group indicates I owe. Please find enclosed my thirty-dollar payment for
the month of October.

                                        Thank you
                                        Amy Smith

CBE Group
1309 Technology Pkwy
Cedar Falls, IA 50613

Amy Smith
7613 Berchman Dr
Huber Heights, Ohio 45424

Date: 7/27/21
Account #:

Dear CBE Group,

This is my sixth request asking for an invoice associated with this debt. I dispute the amount CBE Group indicates I owe. Please find enclosed money order for May, June, and July.

Thank you
Amy Smith

CBE Group
1309 Technology Pkwy
Cedar Falls, IA 50613

Amy Smith
7613 Berchman Dr
Huber Heights, Ohio 45424

Date: 4/13/21
Account #:

Dear CBE Group,
   This is my fifth request asking for an invoice associated with this debt. I dispute the amount CBE Group indicates I owe. Please find enclosed money orders for February, March, and April.

Thank you
Amy Smith

CBE Group
1309 Technology Pkwy.
Cedar Falls, IA 50613

Amy Smith
7613 Berchman Dr
Huber Heights, Ohio 45424

Date: 1/27/21

Account #:

Dear CBE Group,
  This is my fourth request asking for an invoice associated with this debt. I dispute the amount CBE Group indicates I owe. Please find enclosed money order for $60.00 for payment for the months of December and January.

Thank you
Amy Smith

# **EXHIBIT M**



MONEY ORDER RECEIPT - NON NEGOTIABLE

*CBE Group* *Dec and Jan Payment*

AGT 402562 LOC 000219 DT 012421 $60.00 60DOLLARS AND NO CENTS

* 1 9 0 9 3 9 5 7 4 8 1 *



MONEY ORDER RECEIPT - NON NEGOTIABLE

*April* *CBE Group*

AGT 419110 LOC 000758 DT 040221 $30.00 30DOLLARS AND NO CENTS

1 9 2 5 0 0 8 7 6 4 1



MONEY ORDER RECEIPT - NON NEGOTIABLE

*March*

AGT 419110 LOC 000758 DT 030121 $30.00 30DOLLARS AND NO CENTS



1 9 2 3 0 5 6 7 4 2 4





LOAD THIS DIRECTION, THIS SIDE UP

**MONEY ORDER RECEIPT - NON NEGOTIABLE**

CBE Group

AGT 419110 LOC 000758 DT 063021 $90.00 90DOLLARS AND NO CENTS

Payable to:

**RETAIN THIS MONEY ORDER RECEIPT. IT MUST BE INCLUDED WITH ALL REFUND REQUESTS. BE SURE TO READ IMPORTANT INFORMATION BELOW AND ON BACK.** For your own records, it is recommended that you make a photocopy of the completed Money Order before providing it to the receiver.

**PURCHASE AGREEMENT:** You the purchaser agree that Western Union Financial Services Inc. (WUFSI) need not stop payment on, or replace, or refund a lost or stolen WUFSI Money Order unless (1) you fill in the face of the Money Order at the time of purchase, and (2) you report the loss or theft to Western Union Financial Services Inc. in writing immediately, and (3) You provide WUFSI with this original Money Order receipt issued by Western Union Financial Services Inc., Englewood, Colorado. For customer service, call 1-800-999-9660.

*19284446344*

LOAD THIS DIRECTION, THIS SIDE UP

---

LOAD THIS DIRECTION, THIS SIDE UP

**MONEY ORDER RECEIPT - NON NEGOTIABLE**

FEB

doug 280

AGT 419110 LOC 000758 DT 020721 $30.00 30DOLLARS AND NO CENTS

Payable to:

**RETAIN THIS MONEY ORDER RECEIPT. IT MUST BE INCLUDED WITH ALL REFUND REQUESTS. BE SURE TO READ IMPORTANT INFORMATION BELOW AND ON BACK.** For your own records, it is recommended that you make a photocopy of the completed Money Order before providing it to the receiver.

**PURCHASE AGREEMENT:** You the purchaser agree that Western Union Financial Services Inc. (WUFSI) need not stop payment on, or replace, or refund a lost or stolen WUFSI Money Order unless (1) you fill in the face of the Money Order at the time of purchase, and (2) you report the loss or theft to Western Union Financial Services Inc. in writing immediately, and (3) You provide WUFSI with this original Money Order receipt issued by Western Union Financial Services Inc., Englewood, Colorado. For customer service, call 1-800-999-9660.

*19213119349*

LOAD THIS DIRECTION, THIS SIDE UP

-----PAGE INTENTIONALLY LEFT BLANK-----

Insert shipping document here. ▶

ORIGIN ID:DAYA        (937) 496-7623
MIKE FOLEY
CLERK OF COURTS
41 N PERRY ST
ROOM 104
DAYTON, OH 45422
UNITED STATES US

SHIP DATE: 14DEC22
ACTWGT: 0.80 LB
CAD: 110873545/WSXI3100

TO

BILL SENDER

**CBE GROUP INC.**

**CORPORATION SERVICE COMPANY**

**3366 RIVERSIDE DRIVE SUITE 10**

**UPPER ARLINGTON OH 43221**

(937) 496-7623
INV:               REF: 2022 CV 05614
PO:                        DEPT:



FedEx
Express

E



FedEx
TRK#  3921 9979 9230
0201

TUE - 20 DEC AA
EXPRESS SAVER
DSR

30P

ST OSUA

43221
OH-US
LCK

21
K

